## THE DECORAH WOOLEN MILL CO. v. GREER ET AL.

1. **Mill-dam:** ABATEMENT OF: DECREE. The decree entered in the court below, after the case was brought back upon *procedendo* from this court, and fully set out in the opinion, was correct, and the motion made by the defendants to change it was properly overruled.

2. ———: ———: PROPER HEIGHT: HOW DETERMINED. Under a decree for the abatement of a mill-dam to such an extent that it will not interfere with the plaintiff's prior enjoyment of a water-power, the true height at which defendants' dam ought to be allowed to stand should be determined rather by experiments than upon theoretical conclusions drawn from surveys.

3. ———: ———: ORDINARY STAGE OF WATER. Where such abatement is to be made with reference to the *ordinary stage of water*, it means the ordinary stage of water in the spring or other season when the stream stands at high water mark.

*Appeal from Winnesheik Circuit Court.*

WEDNESDAY, APRIL 19.

ACTION in chancery. The relief sought is the abatement and removal of a mill-dam, erected and maintained by defendants upon the same stream and below plaintiff's mill, to such an extent that it will not interfere with plaintiff's rights connected with the water-power used at plaintiff's mill. There was a decree directing the dam to be lowered to a specified extent, from which both parties appeal. The case has been before in this court. See 49 Iowa, 490.

*Willitt & Willitt,* for plaintiff.

*L. Bullis* and *Brown & Wellington,* for defendants.

BECK, J.—I. When this cause was before in this court, we decided that defendants' dam does interfere with plaintiff's right to the fall of the river and free use of the water-power utilized at its mill, and that it ought to be so far abated that it would cease to obstruct the natural flow of the water from defendants' tail-

race. Our conclusion upon this point of the case was expressed in the following language: "The plaintiff is also entitled, according to our ruling, to a decree that the defendants' dam be so far abated as not to interfere with the power which the plaintiff has heretofore enjoyed, to-wit: to the fall of the river as low as the mouth of Spring Branch. Precisely how far the dam should be abated in feet and inches we are not able to determine, nor do we deem it necessary. It can be practically determined when the decree is carried into effect." The decree as to the defendants was, under our decision, reversed and the cause remanded to the court below. The parties entered into the following stipulation for a decree.

"Decree for plaintiff (on *procedendo* from Supreme Court, and in accordance with the opinion on file) that it, plaintiff, is entitled to the fall in the Upper Iowa river as far down as the mouth of Spring Branch, below plaintiff's mill; that the dam of defendants be abated so that it shall cease to interfere with the power of plaintiff as above established. Writ of abatement to issue directing such abatement; the extent of such abatement to be practically determined by the sheriff at an ordinary stage of water, for which purpose the sheriff may call to his assistance a competent engineer; the sheriff to report his doings to the court upon said writ at next term of the court.

"If either party desires, they shall have the right to take exception to his action in relation to such abatement, either on account of the allowance made by him for the varying stages of water that may be reasonably expected, or for any other reason, having regard to the extent of such abatement, and introduce evidence in regard to the extent of such abatement, and the court to make such order or decree, either increasing or modifying the extent of such abatement, as the evidence, etc., will warrant, with all the rights of appeal in relation to such decree applicable to an ordinary decree of this court in equity. Decree also that plaintiff is entitled to maintain its race where now located against all persons except

intervenor. Decree in favor of intervenor, and against defendants, Greer & Hunter, for $500 and costs of suit. Execution to issue therefor."

On the 27th day of March, 1879, after the filing of the *procedendo*, a decree in the following language was entered, pursuant to the foregoing stipulation.

" 1. That as against the defendants John Greer and James Hunter, the plaintiff is entitled to and is the owner of all the head and fall in the Upper Iowa river, between plaintiff's dam, described in its petition, and the mouth of plaintiff's tail-race, or otherwise called the mouth of Spring Branch, and the right to the use and enjoyment of the same to the same extent as it had used and enjoyed the same prior to the erection of the dam by defendants, as set forth in plaintiff's petition.

" 2. That as against the defendants, John Greer and James Hunter, the plaintiff has a right to maintain its tail-race, as set forth in its petition, where it now is, and discharge the water from its mill through the same, free from any interference on the part of defendants.

" 3. That the dam of the defendants, being the same set forth in the pleadings, be abated, so that it shall cease to interfere with power of plaintiff, as above established, and to that end a writ of abatement do issue, directed to the sheriff of this county, directing him to abate the said dam of defendants, as above provided; the extent of such abatement to be practically determined by the sheriff at an ordinary stage of water, for which purpose the sheriff may call to his assistance a competent engineer.

" The sheriff to collect from said defendants the costs of enforcing said writ of abatement, and to report his doings under said writ, with his fees and the costs of such abatement, to the next term of this court, at which term, if either party desire, they shall have the right to take exceptions to the action of such sheriff in relation to such abatement, either on account of allowance made by him for the varying stages of

water that may be reasonably expected, or for any other reason, having regard to the extent of such abatement.

"And on the trial of such exceptions evidence may be introduced in relation to the same as in equitable actions, and the court may make such order or decree, either sustaining the report, or increasing or modifying the abatement made, as the evidence will warrant.

"And the parties shall have all the rights of appeal from such decree as are applicable to any ordinary decree of this court in equity.

"4. That plaintiff do have and recover of defendants the sum of $500 as his damages up to the commencement of this action, with $——— costs, and that execution issue therefor."

Upon this decree a writ of abatement was issued to the sheriff on the 26th day of April, 1879, directing him to cause the dam to be lowered to the extent specified in the decree.

The cause was transferred by consent to the Circuit Court for the reason that the Hon. E. E. Cooley, formerly counsel for defendants, had become Judge of the District Court.

On the 29th day of October, 1879, the sheriff, to whom the writ of abatement was issued, made return thereof in the following language:

"I, J. H. Womeldorf, sheriff of said county, do hereby certify that the writ of abatement hereto attached was placed in my hands for service on the twenty-sixth day of April, 1879.

"I delayed acting upon it for some time, for the reason that there was a prospect for a time that the plaintiff and defendants would agree upon the extent of the abatement. They having failed to agree, I then delayed further, for the reason that the defendants agreed that they would themselves abate the dam as far as they thought it should be abated, and at their own expense. They did lower the dam somewhat— how much I am unable to say—and reported to me that they would not lower it any further. I called to my assistance a competent engineer, Robert Callwell, who took the level of the surface of water at the dam, and at the mouth of plaint-

iff's tail-race in the river. The surface of the water at the dam stood relatively at 99.63 feet, having relation to a certain standard called 100, the basis of the survey. At the mouth of the tail-race, in the river, it stood at the relative height of 99.63 feet—this with plaintiff's gate shut and but little water discharged through the race, and the water drawn down through the gates, etc., at defendants' mill. Then I made a test to ascertain whether the water at the mouth of plaintiff's tail-race was affected by the defendants' dam, by causing the head-gates at the upper end of defendants' head-race, near defendant's dam, to be closed. They were partially closed, sufficiently to raise the water at the dam two and one-half inches. An examination showed that the water in the river, opposite the mouth of plaintiff's tail-race was raised to the same extent as at the dam. Taking this as evidence that the water in the river at the mouth of plaintiff's tail-race was still affected by the defendants' dam, I then caused the dam to be lowered, and then made the necessary measurements and found the water lowered in the river, at the mouth of plaintiff's tail-race, to just the same extent as at the dam. I then caused the dam to be lowered again, with the same result. I lowered the dam in all eleven inches. Estimating that this would lower the water correspondingly, it would leave the surface of the water at the dam, when at the same stage as when the engineer took his levels, relatively to the said standard, 98.72 feet.

"This work was all done, including the taking of the levels, when the water of the river, as near as I could ascertain by diligent and careful inquiry, was at an ordinary stage, except that shortly after commencing to lower the dam the third and last time, in consequence of heavy rains, the water was raised considerably above what it was before, in consequence of which I was unable to proceed further. I commenced to lower the dam on the twenty-third day of August, 1879, and ceased to work on the eighth day of October, 1879. In my opinion, from the result of the previous tests, a further lower-

The Decorah Woolen Mill Co. v. Greer.

ing of defendants' dam will lower water in the river at the mouth of plaintiff's tail-race; and, in the opinion of the engineer called to my assistance as aforesaid, the dam should be lowered so that the surface of the water immediately above the defendants' dam, at an ordinary stage of water, would stand at the relative height of ninety-eight feet, having relation to the standard 100 above mentioned. The top of the sill of the plaintiff's wheel-pit stands, relatively to the same standard, at 98.7-10 feet, as stated by the said engineer. I have not lowered the dam as much as in the opinion of the engineer I should do, and as much as the practical tests made by me would seem to require, for the reason that I am inexperienced in these matters, and am threatened by the defendants with an action for damages for what I have already done. In view of these facts, the height of the water, and the lateness of the season, I deemed it best to report my action to the court, and await its decision in the matter. In what I have before said and done I have not taken into consideration, neither has the said engineer, the varying stages of water; exclusive of floods and freshets that may be reasonably expected, from time to time, in the river. How far this should increase the extent of the abatement I am unable to say, but that it should increase it somewhat is to my mind clear. Neither am I able to state what, if any, allowance should be made to create the proper current between the mouth of plaintiff's tail-race and defendants' dam. If any considerable allowance should be made, it would materially affect the extent of the abatement. Again, should the abatement be regulated and tested with the head-gates of defendants' head-race closed, and the water of the race all discharged over the dam? Conceding this to be correct, it will make a difference of from five to six inches in the extent of the abatement. Which is the proper rule, I am unable to say."

After the return of the writ the plaintiff moved that the sheriff's doings thereon be approved and a decree entered accordingly, and that another writ of abatement issue requiring

the sheriff to abate the dam until the surface of the water thereon shall stand at the relative height of 97, corresponding with the standard mentioned in the sheriff's return; subsequently the defendants filed their motion and exceptions to. the sheriff's return, asking that it be determined that their dam be raised and kept at the relative height of 99.05, instead of 98 as recommended in the sheriff's return, and that plaintiff be required to raise the dam to 99.05. It is averred in the motion that the sheriff lowered the dam six inches below 99.05, the height at which defendants have the right to maintain it. Other matters and allegations contained in the motion need not be here recited.

Afterwards the defendants filed another motion for the correction of the decree last entered in the case, so that it shall give to the plaintiff the right, and nothing more, "to the fall of the river as low down as the mouth of Spring Branch, and to strike out all that portion of the decree that gives the plaintiff the fall to the mouth of their tail-race." It is alleged in the motion that this change in the decree is necessary to make it conform to the decision of this court and the stipulation of the parties. Upon these motions, and· the sheriff's return of the writ, the cause was again submitted to the court and evidence was introduced upon the issue involving the height at which defendants could maintain the dam without encroaching upon plaintiff's rights. Defendants' motion to correct the decree was overruled.

The motion of plaintiff to approve the return of the sheriff was sustained, except that the height of 98 for defendants' dam was substituted for 97 as claimed in the motion. Thereupon the court entered a decree "that the dam of defendants be further abated until the surface of the water thereon at an ordinary stage, stands at the relative height of 98 feet, having relation to the relative height of the sill of plaintiff's wheel-pit * * * * * which stands according to the same standard at the relative height of 98.70."

The plaintiff excepted to the decision of the court fixing

the relative height of defendants' dam at 98 instead of 97 as claimed in the motion, and defendants except to the action of the court in overruling their motions to disapprove the sheriff's return to the writ of abatement and for a decree fixing the height of their dam at 99.05, and they also except to the decision of the court overruling their motion to correct the decree. These exceptions indicate the objections urged by the respective parties to the decisions and decrees of the Circuit Court and the contentions in the case.

II. We will first consider the decision of the court below upon defendants' motion to correct the decree first entered after the case was brought back upon *procedendo* from this court.

The decree, it will be observed, declares that plaintiff is entitled to all "the head and fall" of the stream between its dam 1. MILL-DAM: and "the mouth of plaintiff's tail-race, otherwise abatement of: decree. called the mouth of Spring Branch." The mouth of the tail-race is down the stream sixty feet, or more, from the point which defendants' claim is the mouth of Spring Branch. It follows that it would require a higher dam to back the water to the last named point than to the mouth of the tail-race sixty feet down the stream. If, therefore, the point insisted upon by defendants as the mouth of Spring Branch is the true point intended to be indicated by the quotation from the opinion of this court above given, the dam may be built higher than it could be if the mouth of Spring Branch be sixty feet further down the stream. These statements show the importance of the question involving the precise locality of the point designated in our first opinion as the mouth of Spring Branch.

We are of the opinion that the position of defendants is clearly in conflict with the facts of the case. The tail-race, it will be observed, from what is said in our first opinion, was dug so that the water flowed into Spring Branch, which thus became a part of the tail-race. This was when the tail-race was first constructed. The evidence clearly shows that,

from the first, the tail-race emptied into the stream at the lower of the two points in question. It may be that the water of Spring Branch, or a part of it, emptied, before the tail-race was constructed, at the upper point, but certain it is that after it was used as a tail-race its mouth was at the lower point. It is quite clear that plaintiff, or its predecessors, opened Spring Branch, if it required opening, so that the water emptied into the river at the point farther down stream. This was the mouth of Spring Branch, after it became the tail-race, or was used as such. Of course reference was made to this mouth in our first opinion, for then it had no other mouth, and no other point could have been in contemplation when it was named in our opinion. The plaintiff, as is shown in that opinion, had acquired the right to the land along the tail-race, or Spring Branch, to the point farther down the river. Plaintiff's use of the land, corresponded with this right, and at that point the water from plaintiff's mill had flowed into the river for many years. We reach the conclusion that the decree as entered by the court below is correct and that the motion of defendants to change it was properly overruled.

III. The next question to be considered upon this appeal involves the correctness of the decree rendered upon the return

2. ——:——. proper height: how determined. of the sheriff, requiring the dam to be abated, so that it shall stand at the height of 98, as to the standard adopted by the the sheriff and the engineers. It will be observed that the court followed the recommendation of the sheriff, as presented in his return. The defendants insist that the height of the dam should be 99.05; the plaintiff claims it should be 97, and the sheriff recommends 98 as the true height. The sheriff reduced the height below 99.05, but not down to 98; the defendants insist that it should be restored to 99.05; the plaintiff claims that it should be reduced to 97; the court by its decree fixed 98 as the proper height to which it shall be lowered. We are required to determine which one of these elevations for the dam is correct.

Upon the question for determination, the parties have presented a great volume of testimony. We have the evidence of a number of engineers who have run levels from the dam to plaintiff's mill. The record contains the notes of their surveys, with detailed and extended explanations thereof, showing the relative heights of the dam, of the mouth of the tail-race, of plaintiff's water-wheel, etc., etc., . There is also evidence tending to show the relative heights of these points by comparison with permanent objects in the river or upon its margin, the existence of a ripple below the mouth of the tail-race, etc., etc. This evidence is prolix and extremely intricate. Witnesses and counsel are, of course, familiar with the *locus in quo*,. and in reference to sensible objects, use language and expressions which would be readily understood by them, and one having equal familiarity with the locality and things of which they speak. We are furnished with a photographic copy of what, in the original, may be a well executed and plainly drawn map of the river, tail-race, dam of defendants, and the subdivisions of the land from a point above plaintiff's mill, to another point below defendants' dam, indicating the location of many or all objects referred to in the testimony. This map is diminutive and quite indistinct. From this statement it will be readily understood that to master the evidence, and acquire a correct knowledge of the facts in the case, involved protracted labor. We regret the thought, that the evidence was to be considered by judges who could not have the familiarity with the *locus in quo* and all objects referred to in the evidence which can only be acquired by personal observation and inspection, did not control in the preparation of the case for trial in this court. It would have prompted a clearer presentation of the case and would have saved us much time and relieved us of a great amount of perplexing labor.

Upon a careful consideration of the evidence we have reached the conclusion that 98, as the relative height of defendant's dam, having reference to the standard adopted and

used in the sheriff's return and the last decree of the court below, is too high; we are well satisfied it is not too low. But it is impossible to specify just how many inches too high it is. We are well satisfied that the dam must be abated to 98 at least, and probably to 97. It will be seen from what we shall now proceed to say that a discussion of the evidence is not required.

It appears very plain to us that the true height at which defendants' dam ought to be allowed to stand should be determined, rather by experiments than upon theoretical conclusions drawn from surveys. The instruments used by engineers are more or less imperfect, and mistakes and errors in their use are almost certain to happen. Angel on Watercourses, p. 106: *Brown v. Bush*, 45 Pa. St., 61. A slight variation from the true level, resulting from these causes, would lead to important errors in the final results of the survey. The only true test of accuracy is found in experiments after the work based upon the leveling is done.

It cannot be doubted that if the parties to the suit were to unite in an honest effort to find for themselves the true elevation at which defendant's dam should stand, so that it would not interfere with plaintiff's rights at the mouth of the tail-race, and were both actuated by a desire to do exact justice, they would adopt the common sense, practical course pursued by the sheriff as shown by his return. They would call to their aid an engineer to take levels, and would reduce the height of the dam to accord with the result he should reach. They would then test their work by actual experiment, drawing off the water from the dam and observing its rise at the mouth of the tail-race when the gates of the dam were closed. If they discovered back-water at the mouth of the tail-race, they would, in a prudent and careful way, lower the dam still more, until, in this way, they would find its lawful height. Why should not equity require the same course to be pursued by the officer whose duty it is to abate the dam? The quotation from our former opinion, above set out, con

templates this very course in the language declaring that the height of the dam "can be practically determined when the decree is carried into effect." Experiments in this case would practically correct erroneous theories of the engineers, and the sheriff, in the exercise more probably of common sense rather than learning, pursued, as he recites in his return, the only course that could result in reaching exact justice. Of course, in these experiments, if the dam is taken down too low, the mistake may be corrected by restoring it to the proper height. There can be no doubt that by pursuing the course indicated, it will be discovered what is the exact height at which the dam may be lawfully permitted to stand.

In the decree entered when the cause was returned upon *procedendo* to the District Court, and also in the decree entered upon the filing of the return of the sheriff, which is brought before us for review upon this appeal, it is provided that the abatement shall be done with reference to the *ordinary stage of water* in the river. What is meant by the expression *"ordinary stage of water,"* ought to be here explained. It is used to indicate the stage of water that ordinarily occurs in the spring, or other seasons of the year, when the stream stands at the highest water-mark. It does not mean that stage of water which continues for the longest period of time in ordinary seasons. But the usual rises which are expected, according to the course of nature, in ordinary seasons, produce ordinary stages of water. Freshets and floods, which are unusual, and occur after great storms, cannot be said to cause an "ordinary stage of water," and should not be considered in determining the height of the dam, while the periodical, or other rises of the stream, must constitute the basis of such determination. Washburn on Easements and Servitudes, p. 327, Sec. 13; Angell on Watercourses, p. 546, Sec. 349*a*, *Peer v. McClintock*, 9 Watts, 119.

The decree of the Circuit Court, made upon the return of the sheriff, will be reversed, and the cause will be remanded

for a decree in harmony with this opinion, which shall direct that the dam of defendants be abated until it no longer backs the water up to the mouth of plaintiff's tail-race, otherwise, the mouth of Spring Branch; that such abatement be first made to the height indicated by the figures 98, as used with reference to the standard hereinbefore referred to; that if such abatement is not sufficient to prevent the back-flow of the water to the mouth of the tail-race, further abatement be made, and that the true and lawful height of the dam be determined by practical experiments made in executing the decree.

The decree shall prescribe the manner of the abatement by experiments, the extent, with reference to the ordinary stage of water, as explained in this opinion, and other matters in harmony therewith, all of which shall be made clearly to appear in the writ of abatement to be issued upon the decree.

The decision of the Circuit Court upon defendant's appeal, is affirmed, and the decree upon plaintiff's appeal is

REVERSED.