T. E. WATTERS, Appellant, v. ANAMOSA-OXFORD JUNCTION LIGHT & POWER COMPANY et al., Appellees; STATE OF IOWA, Intervener, Appellant.

WATERS AND WATERCOURSES: Dams—Prescriptive Right to Maintain—Rebuilding. A prescriptive right to maintain a dam with flashboards of a certain height thereon marks the owner's right in reconstructing the dam. Evidence reviewed, and held to show that a permanent, reconstructed dam was three inches lower than the former dam with 20-inch flashboards thereon, and that the owner would, consequently, be limited to the use of 3-inch flashboards on the new dam.

*Appeal from Jones District Court.*—JOHN T. MOFFIT, ·Judge.

MAY 20, 1918.

REHEARING DENIED SEPTEMBER 30, 1918.

ACTION to enjoin the maintenance of a new concrete dam higher than a crib dam which had existed at substantially the same locality for about 40 years. The State, by petition of intervention, prayed for the same relief. On hearing, the court entered a decree enjoining the maintenance of the new dam with flashboards more than 10 inches in height. The plaintiff and the State appeal.—*Modified and affirmed.*

*Remley & Remley,* and *C. A. Robbins,* Assistant Attorney General, for appellants.

*Barnes & Chamberlain, C. B. Paul,* and *George Gorman,* for appellees.

LADD, J.—I. The general course of the Wapsipinicon River, in passing through Anamosa, is southeasterly. A highway bridge, resting on stone abutments, was constructed over the stream, several years ago, and was in existence throughout the period of this controversy. A dam across the river, below the bridge, had existed about 40 years. It had been out temporarily, several times, but was always promptly replaced or repaired. A part of the dam washed out in 1911 and in 1912, and early in 1913, a cement dam was constructed in its stead. Above the bridge a short distance, Buffalo Creek emptied into the river, and the complaint is that the present cement dam is higher than and not so long as the old dam, commonly called a crib dam, filled with stone logs and earth. That the general height of former dams, as repaired or rebuilt, continued practically the same, is not questioned. Their purpose was the operation of a mill, while that of the cement dam is to furnish electric light and power. Plaintiff alleged that this dam is 1½ or 2 feet higher than the old dam and much shorter, and that it backs the water so as to raise it higher in the said river and creek, so as to overflow and thereby injure plaintiff's lands.

The state owns a large tract of land near by, which is used in connection with its Reformatory; and, in its cross-petition, it alleges that one 40 acres is damaged similarly to that of the plaintiff. It appears that, though the other two defendants may have been interested in the dam, by way of construction or otherwise, the Iowa Electric Company is now owner thereof, and the answer puts in issue the allegations of the petition and those of the intervener. The following map indicates the location of bridge and dam, as well as that of the lands owned by the plaintiff and by the state.

The trial court found that the present dam, with
its flashboards, is 14 inches higher than the old dam, with
its flashboards, and enjoined the defendant from maintain-
ing a flashboard on the cement dam exceeding 10 inches in
height. The evidence leaves no doubt that the new dam
backed the water farther up the river than did the old one,
and appreciably raised it higher than it was before; but the
mere showing of such rise, without any proof of the addi-
tional depth of the back water, furnishes no criterion by
which to measure the probable increase in the height of the
dam. This evidence goes no further than to prove injury
to the land of the plaintiff and that of the state, and re-
sort necessarily must be had to the evidence bearing on the
relative heights of the dams, not only to ascertain the cause
of such increase in the river and overflow, but the extent
of the remedy to be applied. If the old dam was of such
height that it held the water back to or above the ordinary
water stage (*Decorah Woolen Mills Co. v. Greer,* 58 Iowa
86), and thereby threw some water back on the lands of the

plaintiff and those of the state, then it may well be assumed that any increase in the height of the dam would increase such overflow. This conclusion is not in conflict with the so-called Massachusetts rule, that a dam owner "has a right to retain it at the same height, although, from the former leaky condition of the dam, the rude construction of the machinery, or the lavish use or waste of the stream, the water has not, in fact, been constantly or usually kept up to that height." *Cowell v. Thayer*, 5 Metc. (Mass.) 253 (38 Am. Dec. 400). See, also, *McGeorge v. Hoffman*, 133 Pa. St. 381; *Baker v. McGuire*, 53 Ga. 245; *Voter v. Hobbs*, 69 Me. 19. Nor is it inconsistent with the contrary rule that the dam may not be maintained at a height which shall raise the back waters above or higher than the level at which the dam has formerly been maintained. *Turner v. Hart*, 71 Mich. 128 (15 Am. St. 243, 251) ; *Stiles v. Hooker*, 7 Cow. (N. Y.) 266; *Burnham v. Kempton*, 44 N. H. 78, 90; *Sabine v. Johnson*, 35 Wis. 185. This is for the reason that, injury having been shown, the measurement of the respective dams will indicate whether more water is being thrown back by the new than by the old dam, and will demonstrate the extent of the remedy essential to the resumption of normal conditions; that is, how much, if at all, the new dam must be lowered.

The evidence shows that flashboards were used on both the old and the new dam; and, if so used continuously, such boards are uniformly adjudged a part of the dam, although not permanent in form, but ordinarily quite efficient in holding the water back. *Robbins v. Powers*, 170 Iowa 223; *National Fire Board Co. v. Lewiston & A. E. L. Co.*, 95 Me. 318, 323; *Ludlow Mfg. Co. v. Indian Orchard Co.*, 177 Mass. 61, 64; *Ely v. State*, 199 N. Y. 213 (92 N. E. 629) ; *Amoskeag Mfg. Co. v. Worcester*, 60 N. H. 522; *Carlisle v. Cooper*, 21 N. J. Eq. 576. If, then, a prescriptive right had been obtained by the use of the flashboards, it necessarily follows

that these may be replaced by a permanent structure to the same height: that is, to the height that shall not increase the level of the flowage water. *Robbins v. Powers,* supra; *Ely v. State,* supra; *Carlisle v. Cooper,* supra; *Pierce v. Travers,* 97 Mass. 306.

II. The evidence that flashboards 24 inches in height were used on the new dam is undisputed. Metcalf, who had owned the old dam from 1892 to 1905, and had been familiar with it since it was first constructed by his father, and had assisted in repairing it several times, swore that, on the last two dams, two flashboards were used, each 10 inches wide. Baum corroborated this, but was not sure whether the boards were 6 or 8 inches wide; as did Templin, who estimated the height of the flashboards at 18 or 20 inches. Moore thought the width of the boards 12 inches, but could not say whether one or two was used; while Dr. King was sure two flashboards were used, each 10 inches wide, one on top of the other. Ingram had seen the flashboards, but did not state the width. There was some variance in the testimony as to how much they were used, but none as to their being employed, whenever the water was low and whenever they were required, though they were frequently taken out by ice and by high water. The evidence warrants the conclusion that they were maintained at a height of 20 inches, and with sufficient continuity and length of time to establish the prescriptive right to their use.

III. Photographs of the old dam were identified as taken at a time when the water was barely flowing over the top without the flashboards. These show the water level to cover less than half of the eighth tier of dressed stone in the north abutment of the bridge. This stone is 20 inches thick. Photographs of the new dam also were identified, taken at a time when the water was barely passing over the top without the flashboards. These show the water level to cover the eighth course of stone in the abutment, and to

stand precisely where it comes in contact with the seventh tier. There could not, then, have been a difference of the depth of the eighth tier of stone between the heights of the two dams, unless the depth of water flowing over the old dam was greater at some places than at others. Wilson, a carpenter, who constructed the forms for the cement bulkhead and head gates across the flume, testified that, in doing his work, he removed a part of the old dam; that the bulkhead, as constructed, was 14 feet above low water; that the old dam was:

"7 feet above low water. The new dam is 9 feet high on the bulkhead, and at the eastern end it is 2 feet higher than the new dam without the flashboards. The south abutment of the bridge forms part of the mill pond right above the dam. On the far end of the dam, there is a concrete bulkhead. It is built there as a retainer or holder of the south end of the dam. It projects from the pier of the bridge in a northerly direction 16 feet. It is made of concrete, and is 3 feet and 8 inches higher than the concrete work of the dam. The fishway passes through this bulkhead, with opening on the level with the top of the dam. It is about 12 or 14 inches wide and 3 feet long. * * * The bulkhead at the north end of the dam is farther in the river than the north pier of the bridge. The head gates at the north bulkhead are wider than the old ones were, and as high as the bulkhead, and made of concrete and steel."

His measurements made the new dam two feet higher than the old dam. On cross-examination, he explained that by low water he meant the point "where the discharge of the water wheel was set to, so there would be no back water on the water wheels. What I had to get was where the old water wheels were set. That was about 40 or 50 or 60 feet below the dam. It was the height of the river at low or ordinary stage of the water. I did not establish this low-water mark. Mr. Hill, the man who was in charge of the electric light

plant in 1910 and 1911, established it. All measurements were made with reference to this. * * * I took a string and leveled it from there. I did not make any record of the measurements made at that time; only we had it there on the retaining wall as it was built. It was there with a pencil or nail."

Later, he again measured from the top of the bulkhead to the top of the present dam, and found the distance to be five feet. This testimony was somewhat corroborated by Benrose, who said that he "had a piece of flint, and marked on the wall where the old dam was; and after they had built the south end of the dam, I measured it, and it was 24 inches or more to the top of the cement of the dam. There are boards on the top of the cement. * * * This dam with the flashboards is four feet higher. * * * We made a survey three or four years ago, just before the new dam was put in. I think Mr. Whalen made it, and Mr. Beam and I paid for it. We were thinking the serving an injunction on them: That is why I went back and marked on the abutment."

Renk swore the dam raised the water from 16 to 18 inches, but his measurements were made about 40 rods above the fish house hollow. Brant thought the water was raised by the new dam from where it was with the old dam a foot, but admitted having told counsel for plaintiff in the morning that the difference was two feet without the flashboards.

Lienen, the city marshal, was of opinion that the new dam without the flashboards "is about 18 inches higher than the old dam was." The plaintiff had made no measurements, but was sure that "they raised the water four feet higher than it was before. I fixed that by the way the river is so much smaller, and since then it has been higher, and the new edge is higher. * * * I made an estimate of the relative height of the old and new dam with the flashboards off."

·Little confidence can be placed in the estimates of the last four witnesses; for, in the nature of things, they could not say with any degree of accuracy the difference in the heights of the dams. The testimony of Benrose, however, seems·entitled to more consideration, as tending to corroborate that of Wilson.

An engineer of considerable experience, Wickham, was engaged in 1910 to run levels for the wheel pits, and testified that, in doing so, he "worked from a bench mark on the end of the pier as you go across the river," which he designated, 100 feet high, as a base from which he measured; that he took the elevation of ·the top of the old dam, and drove a 20 penny spike there; "the floor of the wheel pit was to come· 7.4 feet below the old dam;" that the height of the old dam was 86.2 feet, or the crest thereof 13.8 feet lower than the bench mark.

The engineer, Green, made his measurements after the bridge was completed, and testified:

"There is a bench mark which is 100 on the flat stone on the top of the north abutment of the highway bridge." He measured from this; and, as compared with the height at 100 feet, found the top of the new dam to be 86.02 feet. His bench mark evidently was the thickness of the top stone, or 1.68 feet above that adopted by Wickham. Deducting this 1.68 feet from the 13.98 feet, so as to render the point of measurement the same as that of Wickham, and we have 12.30 feet, as the distance from the bench mark of Wickham to the top of the new dam. Deducting this from the 13.80 feet, the distance from Wickham's bench mark to the top of the old dam, and the difference is 1.50 feet. But it does not appear from what point in the old dam Wickham measured, though inferentially it was in the vicinity of the wheel pit.

The county engineer, Whalen, testified to having made measurements as to the relative heights of the two dams

early in 1912, and that he found the south end of the old dam to be .3 of a foot higher than the new dam, and at the north end, 1.4 feet lower than the new dam; but explained that the indications at that time were that the dam had been broken off "by ice and other things * * * there was some timber broken off; there was a little deflection in the middle from a straight line. * * * They were repairing the old dam with timber and poles at the south end. I couldn't tell you that was the reason it was higher. My idea was to get the elevation of the old dam before the repairs were made. * * * There were points in this old dam that were lower than the points I had for the elevation of the dam the last time. My idea was to. get the elevation of the old dam as it ordinarily was, or, as kept in repair, was. I had the elevations, and they were made upon points that it was 18 inches or 2 feet below. I took measurements of the extreme north and south ends; and to my recollection, there were points in the middle that were lower. The indications were that they had been broken off by ice and other things. I did not take really the extreme north and south points." He testified that the points were 6 or 8 feet from the respective ends.

"You see, 1 foot and 6 inches, that could be easily accounted for; 1.4 feet is 1 foot 5 inches,—that couldn't be readily accounted for. There was not any point in the dam but what there was a variation of 6 or 8 inches in any point of elevation across,—but what there would be a variation of half a foot."

The witness testified that he did not know whether he had reported to plaintiff and Beam that the new dam "was 1 foot and 6 inches higher than the old one." Whalen took the window sill of an old mill as a bench, mark.

Wickham had testified that the old dam in 1910 was of timber, with plank on it; and Harrison, that there was a flat timber at the top of the dam, but it did not increase the

height of the dam. It appears, also, that, during the trial, Metcalf, who had formerly owned the dam, and two other witnesses drew the water off, and measured by the use of a small gas pipe from the bottom of the wheel pit to the top of the pilaster or pier; and according to their testimony, the height was 12 feet and 10 inches. Add to this the 1.25 feet, the width of the I-beams to the height, and it approximates that testified to by Wilson and Wickham. From the crest of the new dam to the top of the new pier, their measurement was 5.4 feet, instead of 5.2, as stated by Wickham; and from this they computed the height of the dam to be 7.6 feet above the bottom of the wheel pit, or, as we understand it, 6 inches higher than Wilson testified the old dam was.

These witnesses ascertained the distance by applying a square or rule to the gas pipes, and probably were not very accurate in their measurements.

The testimony of Whalen, though indicating that some of the old dam had been washed or broken away, furnished no basis for computing the amount; and, though this may have happened, his "idea was to get the elevation of the old dam as it ordinarily was." There is no ground for saying that a timber a foot square had been removed from the top, as do counsel for appellee, nor, in the face of Harrison's testimony, that the top was raised by any timber's being there. Moreover, the testimony of Whalen was that his measurements agree substantially with those of Wickham. The difference of little more than an inch in the heights of the new and the old dam in their measurements emphasizes the accuracy with which these experts did their work.

The photographs of the old and the new dam are conclusive evidence that the new dam is higher than the old one was, and, as the eighth course of stone in the pier is 20 inches thick, furnish strong evidence that the new dam is less than 20 inches higher than the old dam was, and would be conclusive, were the water barely flowing over the old

dam at all places alike. The water appears, in the photo-
graph of the old dam, to be considerably below the center
of the eighth course of stone. Green's measurement fixes
the distance from the top of the new dam at 13.98 feet. This
is corroborated by Whalen, who found the distance from
the top of the pier or abutment, 12.30 feet. The stone lying
above was 1.68 feet thick; and, deducting this from the dis-
tance found by Green, the difference is precisely that testi-
fied to by Whalen. Wickham did not measure the height of
the new dam, though he did that of the old dam, and found
it 13.80 feet below the bench mark he assumed to be 100
feet, for the purpose of comparison. The parties are not
agreed as to the bench mark from which he measured,
whether that adopted by Green or that from which Whalen
computed. Wickham fixed it "as a bench mark on this end
of the pier as you go across the bridge." The stone lying on
the pier was somewhat back from the bridge, and formed no
part of it, and in no manner supported the bridge. Nor did
it extend the other way as far as the course of stone on
which the bridge rested. The record leaves little or no
doubt that Wickham's bench mark was the top of the upper
course of the pier, and on a level with that from which
Whalen computed. Otherwise, the measurement of Wick-
ham, from the bench mark adopted by Green and considered
in connection with the measurement of Green, made the old
dam .18 of a foot higher than the new dam, which is con-
trary to the established fact that the new dam is more than
one half of the thickness of the eighth layer of the stone
in the bridge pier higher than the old dam, and in conflict
with the undisputed evidence that Wickham's measurements
are in substantial accord with those made by Whalen.

Upon a careful examination of the record, we have been
unable to discover any evidence, save, possibly, the breaking
or washing away of the top of the old dam, warranting a
finding that the new dam is less than 1 foot and 4.8 inches

higher than the old dam, and it might not be found to exceed 1 foot and 8 inches higher. Though the new dam is shorter than its predecessor, and one end is farther down the stream, we are not advised by anything in the record that the water would rise in consequence of such change. Our conclusion is that the new dam is from 16.8 to 18 inches higher than the old one, and we are inclined to fix this difference as at least 17 inches. · But 20-inch flashboards were maintained on the old dam; and therefore, defendant the Iowa Electric Company may make use of flashboards not exceeding the difference in height, or 3 inches in width.

In argument, the state challenges the right to construct the dam across the river, on the theory that the state is proprietor of the bottom of the stream. The issue was not raised by the pleadings, and for this reason will not be considered. The decree will be so modified as to enjoin the maintenance of the dam with flashboards or any other device raising the water exceeding 3 inches in height above the new dam.—*Modified and affirmed.*

PRESTON, C. J., EVANS and GAYNOR, JJ., concur.