JAMES M. TURNER ET AL. v. ARTHUR N. HART ET AL.

*Waters and water-courses — Flooding lands—Prescriptive right—*
*Equity—Injunction—Evidence.*

1. In a suit to enjoin the flooding of complainants' lands by the maintenance of a dam at an unlawful height, actual tests by observation and experience afford the most satisfactory testimony upon which to rely in determining the *results* from such obstruction, and are controlling when brought in conflict with instrumental measurements, however accurately and carefully taken. *Mill Co. v. Greer,* 58 Iowa, 86; *Brown v. Bush,* 45 Penn. St. 61.

2. Where a right by prescription to flow land is relied upon, the burden of proof is upon the claimant to show its exercise for at least 15 years to the height complained of and established by the proofs, and that *such* use of the land has been adverse uninterrupted, peaceable, open, and notorious.

3. Title or rights in land founded on prescription originate from the fact of actual, adverse, peaceable, open, and uninterrupted possession for such length of time that the law presumes that the true owner, by his acquiescence, has granted the land, or interest therein, so held adversely.

4. No one can be said to acquiesce in a claim which he cannot dispute by bringing an action at law to determine, and hence the statute of limitations requires that an action shall be brought within 15 years after the right first accrues or the adverse entry.

5. Several land-owners injured by the maintenance of a dam at an unlawful height may join in a bill filed *solely* for *injunctive* relief.

6. It is not always a matter of course to grant relief in a court of equity against the maintenance of a private nuisance, when the law side of the court is open for legal redress. The extent of the injury, its character, the comparative values of the properties affected, and other considerations which may present themselves under the varying circumstances, ought to be duly weighed, and relief afforded or withheld, as equity and good conscience require. *Gilbert v. Showerman*, 23 Mich. 448; *Robinson v. Baugh*, 31 Id. 290; *Edwards v. Mining Co.*, 38 Id. 46; *Hall v. Hood*, 40 Id. 46; *Cobb v. Slimmer*, 45 Id. 176.

7. In a case where the continued maintenance of a dam at an unlawful height involves the practical destruction of 300 acres of land, or over, be its value what it may, and the consequent, and weekly, and perhaps daily, recurring injury to each of the several owners, for which each would have a right of action, causing a multiplicity of suits and vexatious litigation, it is held to be just and equitable to abate the nuisance by injunction.

Appeal from Ingham. (Gridley, J.) Argued April 3, 1888. Decided July 11, 1888.

Bill to enjoin the flooding of land by the maintenance of a dam at an unlawful height. Complainants appeal. Decree reversed, and the cause remanded, with instructions

to enter a decree in accordance with the opinion. The facts are stated in the opinion.

*Cahill & Ostrander,* for complainants, contended:

1. The question is, not how long has the dam been built, but how long has it injured complainants' lands by flooding; citing Gould, Wat. §§ 343, 344; Angell, Wat. § 219; *Holsman v. Bleaching Co.,* 14 N. J. Eq. 335.

2. Any material change in the dam, increasing the burden to complainants' lands unlawfully, will give a right of action; citing Angell, Wat. §§ 378, 380, 381; *Stiles v. Hooker,* 7 Cow. 266; *Russell v. Scott,* 9 Id. 279.

3. The burden of proof is upon him who claims a prescriptive right to flow lands to show its continuous enjoyment for the required period; citing *Hammond v. Zehner,* 23 Barb. 473.

*Hammond & Lee* (*Isaac Marston,* of counsel), for defendants, contended:

1. In order that complainants may join in a suit to abate a private nuisance, the injury must be to all, it must be a matter of one nature, and like relief must be sought by all of the complainants; citing *Reid v. Gifford,* Hopk. Ch. 419, 420.

2. A party injured by a nuisance can only ask for the abatement of that which causes the nuisance; citing *Dyer v. Depui,* 5 Whart. 589; *Greenslade v. Halliday,* 6 Bing. 379; *Wright v. Moore,* 38 Ala. 598; Angell, Wat. §§ 390, 391; *Welch v. Stowell,* 2 Doug. 332; *Moffett v. Brewer,* 1 Green, 348; *Hill v. Sayles,* 12 Cush. 454, 457.

3. Complainants have no joint cause of action, and the proofs show no such circumstances as make their joinder proper; citing *Kerr v. Lansing,* 17 Mich. 34; *Youngblood v. Sexton,* 32 Id. 406; *Ronayne v. Loranger,* 66 Id. 373; *Ryan v. Shawneetown,* 14 Ill. 20; *Supervisors v. State's Attorney,* 31 Id. 74; *Burnett v. Lester,* 53 Id. 325.

4. Complainants have not made such a case as entitles them to equitable relief; citing Hilliard, Inj. 304; Angell, Wat. § 444; *Attorney General v. Ins. Co.,* 2 Johns. Ch. 370, 379; *Van Bergen v. Van Bergen,* 3 Id. 282; *Reid v. Gifford,* 6 Id. 19; *Gilbert v. Showerman,* 23 Mich. 448; *Prentiss v. Larnard,* 11 Vt. 135.

5. It is rather the duty of the court to protect acknowledged rights than to establish new ones; citing *Roath v. Driscoll,* 20 Conn. 533.

6. Equity jurisdiction in cases of a private nuisance rests upon an undoubted right to the enjoyment of the subject in question; citing *Fisk v. Wilber*, 7 Barb. 395; and, if the claim is doubtful, the right must first be established at law; citing *White v. Forbes*, Walk. Ch. 112.

7. The purpose of an injunction is to prevent irreparable mischief; citing *Edwards v. Mining Co.*, 38 Mich. 46, 49; *Gilbert v. Showerman*, 23 Id. 448.

8. In cases where the matter complained of is not *ipso facto* a nuisance, but may be so according to circumstances, these must be ascertained by the verdict of a jury before equity will interfere by injunction; citing Hilliard, Inj. 305; 2 Eden, Inj. 273; *Kirkman v. Handy*, 11 Humph. 406; and where a lawful business affects property injuriously by reason of the manner in which it is conducted, and the injured party has an adequate remedy at law, he must establish his right to relief at law before equity will interfere by injunction; citing *Goodall v. Crofton*, 33 Ohio, St. 271.

9. The constant invasion of complainants' rights for 20 years has established a right of flowage in defendants, though exercised without injury up to the time of the commencement of this suit; citing Washb. Easem. 90; *Mfg. Co. v. Mfg. Co.*, 16 Pick. 241; *Hall v. Augsbury*, 46 N. Y. 622; *Parker v. Foote*, 19 Wend. 309, 314.

10. Flash-boards may be so constantly used as to become a part of the dam; citing Gould, Wat. § 337; *Pierce v. Travers*, 97 Mass. 306; *Marcly v. Shults*, 29 N. Y. 346; *Hall v. Augsbury*, 46 Id. 622; *Carlisle v. Cooper*, 21 N. J. Eq. 596.

CHAMPLIN, J. The bill of complaint in this cause was filed October 14, 1884, to enjoin defendants from damming or obstructing the waters of the Grand river to the extent that it will set back the waters of the Grand and Cedar rivers so as to overflow their banks, and flood complainants' lands, and prevent the natural flowing off and subsidence of the waters of said rivers in the season of high water, and to compel the defendants to remove and abate their dam across Grand river and to so construct and maintain the same as not to flood complainants' lands, or any part thereof.

The bill sets forth that complainants are the owners in severalty of the lands therein specifically described as

belonging to each of said owners, and that they lie along and adjacent to the Cedar river, so called; that the defendants are the owners of a dam across Grand river, in the city of Lansing, and usually known as the "North Lansing Dam," and which they have maintained for three years and upwards, and are now maintaining, at a head of 10 feet, causing the waters of the river to rise to a great height, and set back into the Cedar river, an affluent of the Grand river, and to overflow the banks of the Cedar river, so that large portions of complainants' lands have been for three years overflowed, and are being again threatened with being overflowed and completely submerged whenever the waters of said rivers are at their usual and ordinary height, to the great injury and detriment of complainants.

The bill further alleges—

"That but for the maintenance of said dam no part of your orators' or your oratrix's lands would be overflowed or submerged by the waters of said Cedar river, except small portions thereof, and for brief periods, during unusual floods and high water, but by reason of said dam the waters of said river are impeded and held back, and have been and are caused to stand for long periods of time— that is to say, during the seasons of 1882 and 1883, during the months of March, April, May, June, and July, in each year, and during the season of 1884, during the months of March, April, May, and June—over your orators' and your oratrix's lands hereinafter described, whereby they have wholly lost and continue to lose the rents, issues, and profits of said lands, to their great damage; that your orators' and your oratrix's lands are all tillable lands, fit for cultivation, except for the flooding of the same as aforesaid, but by the reason of the maintenance of said dam, and the flooding in consequence thereof, the said lands are rendered untillable and useless for the purpose of cultivation."

The bill also sets forth the particular portions of land belonging to the complainants which are flooded.

Nine of the defendants answered, and admitted the exist-

ence of the dam as stated in the bill, and that they were owners thereof, and as such interested in the water-power created by such dam. They aver that the dam was constructed over 40 years ago in pursuance of lawful right and authority for that purpose duly acquired from the State of Michigan, and has ever since that time been kept up and maintained to the same height that it is now kept up and maintained; that complainants acquired their land long after the erection of the dam, and subject to the rights of the owners thereof, and their grantees, and deny that they have kept up a dam at a height of 10 feet, or any other height which is unlawful or contrary to the rights of complainants, and they deny that the lands of complainants are overflowed by reason of said dam, and they deny that they have injured complainants, or threaten any injury to them, by reason of maintaining such dam. A demurrer clause is added, praying the same benefit as if they had demurred for want of equity.

The only authority granted by the State for building a dam across Grand river at or near where this dam is located, is that conferred by Act No. 98, Laws of 1843, in which John W. Burchard, his heirs and assigns, were authorized to build a dam across the Grand River, in Ingham county, on section No. 9, township 4 N., range 2 W., "not exceeding eight feet in height." It was provided in that act that—

"Nothing herein contained shall authorize the person or persons above mentioned, or their heirs or assigns, to enter upon or flow or injure the lands of any other person, without the consent of such person."

The defendants did not attempt to deduce their rights from Burchard, or from the grant by the State to him. It was wholly immaterial for them to do so, since the complainants do not deny the right of defendants to maintain a dam across Grand river, but deny their right

so to construct or maintain it as to cause the water to set back and overflow their lands. The State did not authorize them to do this without the consent of the owners.

There was testimony which tended to show that a dam has been maintained at the point where the present dam is located since the fall of 1843; that in 1875 the greater portion of it was swept away, and it was that year rebuilt to a height of 7½ feet; that after that date, and until 1881, the owners had been in the habit of increasing the head of water afforded by the dam, by the use of flash-boards, from 12 to 18 inches in height. It was shown that flash-boards had always been used during certain seasons of the year upon the old dam prior to the year 1875. In 1881, repairs were made upon the dam by increasing its permanent height 12 inches, intending thereby to do away with the use of flash-boards. The effect of this has been to hold the water more uniformly than it was by the use of flash-boards. The dam was also made generally tighter, and less loss occasioned by leakage.

The testimony shows that the complainants had owned the several parcels of land described in the bill as belonging to each individual from 8 to 20 years; that they had made improvements thereon, and brought the land under cultivation, and raised crops thereon, had put down drains by which the waters were drained into Cedar river, and had experienced no difficulty from high water, or flooding or overflow, until the repairs were made upon the dam in 1881; and from that time the water has been set back upon their lands, causing a loss of crops, the killing of native trees, and the destruction of the land for agricultural purposes. The proof is ample and convincing that, since the repairs made in 1881, the water has been, on an average, a foot higher in Cedar river

along complainants' lands than it was before, destroying the drainage, and causing the water to set back and soak up the soil of complainants' lands, and rendering them wholly unfit for cultivation.

Testimony was introduced of levels taken of the dam up the Grand and Cedar rivers for the purpose of showing that the waters in Cedar river were not affected and raised as far up the river, nor to such height, as claimed by the complainants. Owing to the impossibility of arriving at precisely accurate results by the use of instruments, running over a line six miles in extent, involving a great number of stations, and the adjustment, taking, and registering of levels thereat, and the many different circumstances, explainable and unexplainable, which affect the action of water when obstructed and ponded in running streams, actual tests by observation and experience afford the most satisfactory testimony upon which to rely in determining the results from such obstruction. *Mill Co. v. Greer*, 58 Iowa, 86 (12 N. W. Rep. 128); *Brown v. Bush*, 45 Penn. St. 61.

Every author treating upon the subject of hydrodynamics acknowledges and points out the difference between theoretical and actual tests, and, in advancing practical rules, modifies the theoretical to correspond as nearly as possible to actual observation and experience. We think the observation and experience of the witnesses introduced by complainants is controlling when brought in conflict with instrumental measurements, however accurately and carefully taken.

Testimony was also introduced showing that the actual structure of the dam in the river varied from 7 to 16 feet in height, and also that, as at present constructed, it is not so high as the dam was prior to 1881, including the flash-boards. Notwithstanding all this, the proof is positive that complainants' lands were not injured by the

dam, which included the flash-boards, prior to the year 1881.

The defendants sought to account for this upon two hypotheses:

1. By the clearing up of the country, and by the construction of drains, the waters, draining large tracts of country, flowed off into the Cedar and Grand rivers more quickly, and thus the water was raised to a greater height than had hitherto been ordinary by natural causes.

2. That the average rain-fall had been very much greater since 1881 than before, and this caused naturally a higher stage of water.

Testimony was offered in support of both these propositions, but I do not think either of them was established by the testimony introduced. Experience has shown, what would naturally be expected to follow, that as the country is cleared up, improved, and drained, the streams, which are the natural conduits for surface drainage, become materially lessened in volume, owing partly to the greater facility for conducting the surface water into them after rain-fall, and partly from the greater quantity evaporated, and also the greater quantity taken up and absorbed by the dryer soil, caused by drainage.

The average rain-fall, as shown by the table introduced in evidence of measurements taken by Prof. Kedzie at the Agricultural College, has been greater since 1879 than previously. The dam was rebuilt in 1875. From that date to 1880, inclusive, the average rain-fall, for the six years, was 33.15 inches. The succeeding six years shows an average of 35.81 inches.

Witnesses introduced on the part of defendants also testified, from their observation, to there being a greater volume of water flowing in Grand river since 1881 than before; but to what extent the volume was increased from natural causes, and whether such increased flow had any effect in setting the water back upon complainants' lands,

was not shown, and was left to conjecture; while the evidence is positive that during the week, when the mills at North Lansing were using the water from the dam, after Monday the water was drawn down in the Cedar river materially, and by Saturday night it set back no higher than it did prior to 1881; but while the gates were shut from Saturday night to Monday morning, their lands were again flooded, the difference in water level being about one foot, and in summer time, when there was low water, the variation would be as great as two or three feet.

No grant of the right of flowage of the lands of complainants is claimed. The defense rests upon rights acquired by prescription; and in such case the burden of proof is upon the defendants to show that they have, for a period of 15 years at least, each year flowed complainants' lands to the height complained of and established by their proofs, and that such use of complainants' lands by flowage has been adverse, uninterrupted, peaceable, open, and notorious. No testimony was introduced to show that the effect of the old dam, with or without the flash-boards, was to set the water back and to flow over complainants' lands to the height it has since 1881, nor to show that it so flooded the land as to interfere with or destroy the crops of complainants prior to that time, for a period of 15 years. This branch of the defense has utterly failed for lack of proof.

It was claimed on the part of counsel for defendants that we should apply the rule adopted in Massachusetts, and laid down in *Cowell v. Thayer*, 5 Metc. 253, and approved in *Ray v. Fletcher*, 12 Cush. 200, that the height to which a mill-owner will have a prescriptive right to maintain the water will depend upon the height of the dam by which he has raised it, and not upon the height such dam has set the water back and flowed the land in question

during the prescriptive period; and, therefore, if he repairs. the dam without so changing it as to raise the water higher than the old dam, when tight and in repair, would raise it, and thereby keeps the water more constantly and at a greater height than before, it is not a new use of the stream, but a use conformable to his prescriptive right.

We cannot accede to this doctrine. It is antagonistic to the principle which underlies the doctrine of prescription. Title or rights in lands founded on prescription originate from the fact of actual, adverse, peaceable, open, and uninterrupted possession for such length of time that the law presumes that the true owner, by his acquiescence, has granted the land, or interest to the land, so held adversely. But no one can be said to acquiesce in a claim which he cannot dispute by bringing an action at law to determine, and hence the statute of limitations requires that an action shall be brought within 15 years after the right first accrues or the adverse entry. The defendants, therefore, acquired no right by prescription to the lands in question until they showed that the acts which constituted the adverse user injured complainants, and gave them, or to those under whom they claim title, a right of action. *Holsman v. Bleaching Co.*, 14 N. J. Eq. 335; *Smith v. Russ*, 17 Wis. 234; *Sabine v. Johnson*, 35 Id. 185; *Burnham v. Kempton*, 44 N. H. 90; *Griffin v. Bartlett*, 55 Id. 123; *Mertz v. Dorney*, 25 Penn. St. 519.

It is urged that relief should be denied to complainants for the reason that they have each separate interests, and are differently affected, at least in degree, by the act complained of, and are therefore improperly joined in this suit. As the bill does not ask for an accounting, but only for injunctive relief, we think it is maintainable, under our former decisions. *Scofield v. Lansing*, 17 Mich. 437; *Middleton v. Booming Co.*, 27 Id. 533; *Robinson v. Baugh,*

31 Id. 290; *Fox v. Holcomb,* 32 Id. 494; *Cobb v. Slimmer,* 45 Id. 176.    More especially are we inclined to so hold where the objection was not taken by special demurrer, but the parties have taken their proofs, and proceeded to a hearing thereon.

The fact that there are several complainants praying the same relief does not materially affect the propriety of the decree.    Story, Eq. Pl. § 544, and note 2.    Nor do we experience any difficulty in granting relief.    Although it is true that the lands situated lower down the Cedar river are flooded to a greater extent than those farther up, yet, if complete relief is given to the one situated lowest down, those farther up must of necessity be relieved.

We think the complainants have made a case by their proofs, and the only serious difficulty we have had to contend with is whether we should grant the relief prayed. It is not always a matter of course to grant relief in such cases, in a court of equity, when the law side of the court is open for legal redress.    The extent of the injury, its character, the comparative values of the properties affected, and other considerations which may present themselves under the varying circumstances, ought to be duly weighed, and relief afforded or withheld, as equity and good conscience require.    *Robinson v. Baugh,* 31 Mich. 297, 298; *Fox v. Holcomb,* 32 Id. 494; *Cobb v. Slimmer,* 45 Id. 176; *Hall v. Rood,* 40 Id. 46; *Edwards v. Mining Co.,* 38 Id. 46; *Gilbert v. Showerman,* 23 Id. 448.

The testimony of complainants shows that there are about 300 acres of land belonging to them which are flooded and practically destroyed for agricultural purposes by reason of defendants' dam being maintained as at present; that such land is worth about $50 an acre, and its annual rental value is about $3 an acre.    We have the testimony of defendants, who estimate the value of their mill property at $150,000, and they gave testimony tend-

ing to show that, if the dam was reduced to the height it was before the repairs of 1881, it would depreciate their property one-half, or $75,000. Upon these estimates we have a loss or depreciation, upon one side, of $15,000, and, upon the other, of $75,000. I think both sides have estimated their loss rather large. It appears to me especially that the depreciation in the value of the mill property is greatly overestimated. Some of the mills are at the present time supplied with steam-power to aid them in case of low water.

The testimony of defendants shows that, prior to the permanently raising of the dam in 1881, the mill-owners got along very well with the dam at the height it then was, with the aid of flash-boards, and that they had as much power as they now have; and that, should this method be resumed, the mill-owners would have all the power they had enjoyed prior to 1881.

In view of the practical destruction of 300 acres of land or over, be its value what it may, and the consequent, and weekly, and perhaps daily, recurring injury to each of the complainants, for which they severally would have a right of action, presenting a multiplicity of suits and vexatious litigation, it appears to us to be just and equitable that defendants should be decreed to abate and remove the top of their dam so as to lower the structure 12 inches, and that they should perform such decree on or before the first day of December next, and that they should be enjoined from raising the water at their said dam so as to cause the water to set back and overflow the lands of complainants, or either of them, or to such height as will cause the water to set back and percolate through the soil of complainants, or either of them, to a greater extent than was customary or usual prior to the time repairs were made upon said dam in 1881.

The decree of the circuit court for the county of Ing-

ham must be reversed, with costs of both courts, and the cause remanded to that court, with instructions to enter a decree in said cause in favor of complainants and against defendants, in accordance with the foregoing opinion.

SHERWOOD, C. J., CAMPBELL and LONG, JJ., concurred. MORSE, J., did not sit.