## MILLER *v.* BANK OF BELLEVILLE.

1. WATERS AND WATERCOURSES — MILLDAMS — FLOWAGE — PRE-
SCRIPTIVE RIGHTS—EXTENT.

   The prescriptive right of flowage of land arising from the
   maintenance of a milldam does not give the right to maintain
   in its place a more perfect dam of the same height offering
   greater obstruction to the flow of water.

2. SAME—INJUNCTION—EVIDENCE—SUFFICIENCY.

   On a bill to enjoin the maintenance of a milldam above a cer-
   tain height, evidence examined, and *held*, to establish that
   defendant's dam is a higher and more perfect structure than
   previous dams upon which its prescriptive rights of flowage
   are founded, and that as a result the water in the river
   where the lands of complainants abut upon the same is
   caused to stand upon a higher level than formerly.

3. SAME—LACHES.

   The right of landowners to relief by way of injunction against
   the maintenance of a milldam above a certain height, *held*,
   not barred by laches, in view of the pendency and dismissal
   of a suit by the township on the agreement of the defendant
   to satisfy the landowners, the steps taken by the defendant
   to relieve conditions, and the absence of evidence to indicate
   that complainants had reason to apprehend that the dam
   complained of would be so constructed as to affect their
   lands in any other or different way than former dams had
   done.

Appeal from Wayne; Donovan, J.   Submitted January
10, 1907.   (Docket No. 15.)   Decided May 18, 1907.

Bill by Halen F. Miller and others against the Bank of
Belleville and another to restrain the flooding of certain
lands.   From a decree dismissing the bill, complainants
appeal.   Reversed, and decree entered for complainants.

*Moore & Moore* (*Samuel W. Burroughs*, of counsel),
for complainants.

*E. P. Allen* (*Haug & Yerkes*, of counsel), for defend-
ant bank.

OSTRANDER, J. The bill is filed by a number of land-owners to restrain defendant from flooding lands. The specific relief asked for is the lowering of a dam maintained by defendant Bank of Belleville 13 inches, the maintenance and operation in said dam of suitable flood gates. The dam is built in the Huron river on section 21, in Van Buren township, Wayne county. The right of defendant to maintain the dam is not denied, nor the right to flow such lands and to such extent as they were flooded by a dam built about the year 1839, and known as the "Bell Dam." Defendant claims no other or greater rights than were gained by prescription by the owners of the Bell dam, and denies that its dam does, in fact, flood more land than did the Bell dam. During its existence portions of the Bell dam were repeatedly washed away, and in 1894 a new dam, called the "Pelant dam," was built some 100 feet above the site of the Bell dam. In the year 1900 the Pelant dam was, in turn, washed away, and the present dam, called the "Coomer dam," was constructed 70 rods below the site of the original or Bell dam. The Coomer dam was completed in November, 1900. In October, 1901, Coomer began the erection of a new mill, to be operated by the water power, and the mill was completed and in operation in February, 1902. The cost of the mill and machinery was a sum between $10,000 and $13,000.

Since the construction of the Coomer dam, the water above the dam has been uniformly higher than it was before, and the lands of complainants have been, to some extent, damaged by the higher water. This was the finding of the court below, and is one with which counsel for defendant agree. But the court was of opinion that the Coomer dam did not cause the high water, and that it was due to the fact that there had been a larger rainfall and greater volume of water in the river since the year 1901 than there had been in previous years. The records of observations of the rainfall at various nearby points which were introduced in evidence are, as would be expected, not

in precise agreement. Those for Ann Arbor and Ypsilanti go back, some of them, for less than 20 years. The record of the United States Weather Bureau of the rainfall at Detroit from 1871 to 1904, both years inclusive, shows a mean annual fall of 32.13 inches. The falls for the years 1900 to 1904, inclusive, are 31.45, 28.78, 35.53, 35.88, 28.32 inches. For these years the observations taken at the Detroit observatory at the University of Michigan are 26.17, 26.09, 41.50, 35.63, 28.21 inches, showing the effect in 1902 of a rain which perceptibly increased the volume of water in the Huron river, causing a portion of the abutment of the Coomer dam to be washed away. The observations at the University show rainfall for years 1895 to 1899, both years included, of 25.89, 32.27, 32.49, 31.63, 24.75 inches. The difference of some 10½ inches in these two five-year periods is found in the months of June and July, 1902, in both of which there was an excessive local rainfall. A careful study of those records and of the testimony of the witnesses leads to the conclusion that the rainfall indicated does not account for the increased height of water above the defendant's dam.

There is no evidence tending to prove that the Bell or the Pelant dams raised the water to its present height. Indeed, it is not contended that they did. The observation of the landowners and others, of the effect of the water upon the lands before and since the year 1901, the fact that tile drains and ditches which before that year performed their offices have since been covered or filled with water, and that this has not been and is not a mere temporary condition, strongly support the conclusion that the Coomer dam obstructs the flow of water past these lands to an extent unknown while either of the other dams was in existence. Defendant offered evidence to support the contention that it had, in fact, a dam no higher than the Bell dam. If that fact were established, it would not follow necessarily that it did not offer greater obstruction to the flow of water. Indeed, it is established that the Bell dam was very infirm, leaked badly, and was

repaired annually. *Turner* v. *Hart*, 71 Mich. 128, 137, 138.

The present dam is some 70 rods farther down the stream, where there is a narrower channel. The fall in the bed of the river between these two points is not shown. There is some fall. There is positive testimony that the Coomer dam is some 13 inches higher than the Bell dam was, and equally positive testimony that its crest is little, if any, higher than that of the Bell dam. None of this testimony is convincing, unless we are able to find which one of two starting points for levels which were taken is shown to be the proper one. Various witnesses claim to have knowledge sufficient to enable them to tell where the top of the Bell dam was. These witnesses do not agree. It is shown that levels were taken from these (disagreeing) points to the Coomer dam, resulting in the demonstration that that dam is no higher (or that it is much higher) than the Bell dam was. It is clear that, if the crest of the Coomer dam is level with the crest of the Bell dam, the Coomer dam is higher than the Bell dam was. If, for example, the Coomer dam is built at a point two feet lower than the one where the Bell dam stood, and was built no higher than the Bell dam, its crest should be upon a level two feet below that of the crest of the Bell dam. We have read the record with care to discover the evidence upon which is based the assertion that these two dams were constructed of the same height. We do not find it. On the contrary, the testimony, other than that relating to the increased height of water, which seems to us to be most satisfactory upon this subject, leads to the conclusion that the Coomer dam is higher than the Bell dam was. We find this evidence in the testimony, meager as it is, of the actual measured height of these dams and the head of water. It is conceded that the Pelant dam was of the same height as the Bell dam. The evidence is, and it is not disputed, that the height of the Pelant dam was 5½ feet. The man who built the Pelant dam testified:

"The height of the water head was 5½ feet in both the Bell and Pelant dams. I know because I took the level from the Bell dam when I built the Pelant. I mean by the head the crest."

A measurement made December 9, 1902, by an engineer, showed, and no effort was made to dispute the fact, that the crest of the new dam above the apron is 6.45 feet. The same engineer, on the same date, found the head of water at the Coomer dam—from head water to tail water—7.06 feet. A witness for defendant testified, and this is undisputed, that the apron of the Coomer dam was 11½ inches from top to bottom, and the posts, the upright pieces, which made the dam, were about 5 feet 10 inches long, the cap about 8 inches. If the apron was entirely above the bottom of the river, we have a structure some 7 feet 5½ inches in height. Flash boards were used on the Bell dam. Assuming they were a foot in width, the actual height of both dam and flash board would not be equal to the height of the Coomer dam. There is other evidence, not here repeated, which supports the finding that the Coomer dam is, in fact, a higher and a more perfect structure, a greater obstruction to the flow of water, than was either the Bell or the Pelant dam, and that as a result the water in the river where the lands of complainants abut upon the same is caused to stand at a higher level than it used to stand. It would seem that the evidence of the precise height of these dams, and of the difference in elevation between the spot where the Bell and that where the Coomer dam was constructed, with specifications of the water which leaked through the old dams and flumes, should have been more certain. The evidence afforded preponderates in favor of the position of complainants. It is matter of common knowledge that lands may be damaged, even though not covered, by water which stands along them. We therefore necessarily ascribe some of the damage to complainants' lands which is asserted to the obstruction of the water by de-

fendant's dam, and, as defendant asserts no right to maintain the water at its present height, and does not attempt to fix the point to which, by prescriptive right, it might lawfully flood the lands, relief should be given as prayed, unless there is some satisfactory reason for refusing it.

It is urged that complainants have been dilatory in making their complaint, for which reason the court should hold them estopped to ask that the dam be lowered. The facts are that in December, 1902, the township brought suit against the owners of the dam, and that this suit was dismissed upon an agreement of the owners to cut the dam down 10 inches on the west and 13 inches on the east end thereof in default of having, before a day named, purchased the right of flowage or otherwise satisfied landowners on the river. Said dam owners also agreed to indemnify the township for any loss or damage in consequence of setting back the water. If, before the day certain, the dam owners succeeded in satisfying said landowners, so as to allow the dam to remain at its present height, then the township was to raise its bridge, a few feet below which the dam was built, three feet, and the owners were to properly construct the roadway affected. This agreement was not carried out for the reason that the owners of the dam became, as they claim, convinced that the survey which showed their dam to be too high was erroneous. The bill in the present case was filed in April, 1905. The agreement referred to fixed July 15, 1904, as the limit of time allowed to secure the necessary right of flowage. The suit was not discontinued until November, 1904. Meantime, in 1903, as appears from correspondence between counsel, the owners had put a waste gate in the dam which they asserted would take care of the surplus water, and had secured estimates, or an estimate, of the expense of cutting down the dam. There were, then, proceedings pending and an existing agreement, of which, we assume, complainants and others

in the township had knowledge; the possible and probable result being an accommodation.   Under such circumstances, it would be an extreme application of the doctrine of estoppel by nonaction to deny relief to which complainants are otherwise entitled.   In this respect, the present suit and *Blake* v. *Cornwell*, 65 Mich. 467, and *Miller* v. *Cornwell*, 71 Mich. 270, should be distinguished.   There is here nothing to indicate that complainants had reason to apprehend that the new dam would be so constructed as to affect their lands in any other or different way than former dams had done.   Nor does it appear that the effects now complained of would become immediately noticeable. In the year 1902 the great rainfall may have been held responsible for conditions then appearing.   The action of the township authorities, if successful, would amend the condition.   Defendant is not in the position of one giving notice of the intention to raise the water to an unwarranted height; and even now asserts that it is exercising no more than its prescriptive rights.

Some evidence was given of the cost of cutting down the dam, to prove that the expense will be small, and some evidence, also, of the resulting damage to the millowner in loss of power.   The millowner has no right to profit out of the water at the expense of those upper proprietors whose lands abut upon the stream.   Moreover, it does not appear that the mill cannot be operated to its capacity with the head of water which will be afforded with a dam 13 inches lower.   On the other hand, it appears that several hundreds of acres of complainants' lands are injuriously affected, with a large aggregate annual loss.

The decree below is reversed, and a decree will be entered in this court requiring the defendant Bank of Belleville to lower its dam 13 inches at the east side and 10 inches at the west side, the crest to be made level, within 90 days from the entry of said decree, unless counsel shall agree that for any reasons this time should be extended, from and after which time said defendant will

be perpetually enjoined from maintaining its said dam at its present, or at any, height above the level thereof so fixed. Complainants will recover of said defendant the costs of both courts.

McALVAY, C. J., and GRANT, BLAIR, and MONTGOMERY, JJ., concurred.