BROCKWAY *v.* HYDRAULIC POWER & LIGHT CO.

1. WATERS AND WATERCOURSES — RIPARIAN RIGHTS — FLOODING LANDS.

It was not necessary to aver, in a bill of complaint to enjoin flooding complainants' lands, that defendant was the owner of the dam in controversy and land on which it was located, where the bill charged that defendant was in possession of the dam, and referred to it as defendant's, and the defendant in answering likewise mentioned the dam as "its dam," and charged that defendant had expended large amounts of money upon it.

2. SAME—EQUITY—INJUNCTION.

Although the damage to the owner of the dam may be greater than the loss to riparian owners whose land defendant's acts flood, it is *held*, under the evidence, that the owners of several hundred acres injuriously affected by the raising of a lake may maintain suit to restrain the overflow beyond a height at which defendant by pre-

scriptive right from long use was entitled to impound the water.

8. SAME—PRESCRIPTION.

Prescriptive rights arising from the maintenance of a dam cannot be increased by raising the crest of the dam or by maintaining a tighter and more perfect dam at the same height, thus forming a greater obstruction to the flow of water and increasing pondage.

Appeal from Antrim; Lamb, J., presiding. Submitted January 24, 1913. (Docket No. 24.) Decided May 28, 1913.

Bill by Samuel Brockway and others against the Hydraulic Power & Light Company to restrain defendant from flooding lands of complainants. From a decree for complainants, defendant appeals. Affirmed.

*Covell & Cross* and *Thomas D. Meggison,* for complainants.

*Fitch R. Williams (E. N. Clink* and *C. L. Bailey,* of counsel), for defendant.

STEERE, C. J. This is an injunction suit involving the alleged flooding of lands by damming. It was heard on pleadings and proofs, taken in open court, and comes here on an appeal from a decree of the circuit court of Antrim county in chancery in favor of most of the complainants, requiring the defendant to lower the wasteweir of its dam on Intermediate river 24 inches, and restraining it from maintaining said dam at any greater height. The bill of complaint is filed by 12 riparian owners whose lands, amounting to several hundred acres, have a water frontage upon Intermediate lake of several miles in extent. Complainant Brockway owns and has occupied for many years a small island, containing about 1½ acres of land, located about a mile from the south extremity

of Intermediate lake, on which he has erected various buildings and maintained a summer resort. This lake is long and narrow, its outlet being Intermediate river, which is one of the connecting links in a continuous chain of lakes and streams extending nearly across Antrim county, with an outlet into Grand Traverse Bay at Elk Rapids. Defendant, a Michigan corporation, maintains an electric lighting plant in the village of Bellaire, and obtains water power developed at a dam on Intermediate river located from $1\frac{1}{8}$ miles to $1\frac{1}{4}$ miles below the lake and about $2\frac{1}{4}$ miles from Brockway's island. Defendant's predecessors erected a dam, in the year 1881, upon said river at the location of the present dam, constructed of sand and gravel, with a plank and timber curb at the spillway, with a height of eight feet of water at the dam and by cutting a tailrace across the neck of land at a lower point in the river secured a head of $9\frac{1}{2}$ feet of water at the wheel-pit. About ten years before the trial of this cause repairs were made on the flume and race-weir of that dam so as to carry a head of 13 feet at the wheel. In 1904 the head of water is shown to have been 12 feet. In the year 1906 the dam in controversy was built upon the side of the old dam, and, by the use of an eight-inch flashboard at the spillway, together with dredging in the river below, a head of 16 feet 4 inches was obtained.

The bill of complaint was filed in this cause in 1908, and alleges, among other things, that this new dam, wasteweir, and flashboards erected within the preceding year and a half raised the water very materially above the level of the old millpond in the river and so high as to raise Intermediate lake above its normal level, causing it to overflow and seriously damage large areas of land owned by the complainants in and on the borders of said lake.

Defendant, answering, denies that the new dam was built any higher than the old, or that it retarded the

flow of water from Intermediate lake and through the river to any greater extent than did the old dam, or caused the water to rise and overflow the lands of complainants to any greater extent than formerly, and again raises the point, previously raised by a demurrer which was overruled, that the bill of complaint contains no allegation that defendant owned or controlled said dam.

It is now urged and argued in defendant's brief, as a defect fatal to complainant's case, that ownership of the dam by defendant is neither alleged nor proven. If ownership and title to the realty and technical proof of the same, were essential to the issue involved, this question might require more serious consideration. Complainant's claim of injury is not based on what defendant owned, but on what it did and is doing. The pleadings and proofs on both sides fairly present such issue. The bill of complaint alleges that:

"Defendant is possessed of a certain parcel of land situated in the village of Bellaire * * * upon which is located an electric light and power plant, with millpond, millrace, wasteweir, and the necessary equipment to operate the said electric light and power plant by water power. * * * Said dam is located on said river about one mile below said lake. * * * That the said defendant's dam and the wasteweir therein has been built much higher than the old dam and wasteweir causing the waters of said stream to rise in the pond formed by defendant's said dam to a height of five or six feet above the level of the waters of said old millpond, and the defendant's said dam is so constructed that by the use of flashboards, etc., * * * by reason of the construction and maintenance of said dam and the raising of the waters of said stream in said pond, as aforesaid, the waters of said Intermediate lake have been raised considerably above their normal level and caused to overflow and flood large areas of land lying along the border of said Intermediate lake which were not previously flooded," etc.—

repeatedly throughout the bill of complaint

designating the dam in question as "defendant's dam" and stating what defendant had done in that connection.

Defendant, in its answer—

"Admits that the Hydraulic Light & Power Company is a corporation, etc., * * * that it is possessed of a certain parcel of land situated in the village of Bellaire; * * * but denies that upon said land so possessed there is a millpond, millrace, and wasteweir; admits that it has an electric light and power plant and necessary equipment to operate said light and power plant by water power; admits that the water power used to operate said plant is obtained by damming a stream known as Intermediate river which is the outlet of a body of water situated in said county; * * * denies that it owns the land upon which said dam, millpond, millrace, and wasteweir are situated."

And—

"This defendant, further answering, alleges and so charges the fact to be that it has built, at the expense of many thousands of dollars, a large and up-to-date water power, electric power house, fully equipped with all necessary machinery for generating electricity; * * * that if defendant should be decreed by this court to lower *its dam* it would suffer a loss of many thousands of dollars through loss of power; * * * that it has carried a head of water not to exceed 16 feet at *its present dam* and, by so doing, with the amount of head obtained by dredging the stream below, and the normal level of Intermediate lake, has not raised the water of Intermediate lake, so called, as alleged by complainants in their bill."

The respective pleaders appear to be in harmony in designating the dam, over which this controversy arose, as belonging to defendant and in applying their respective averments of what defendant did or did not do to this identical dam, and the proofs are along the line of their allegations. It is fairly shown by the pleadings and proofs that defendant is in possession

of, maintaining, controlling, and operating the dam and water power which is the subject-matter of this controversy.

There is no claim of right by purchase to flood complainants' lands. What rights defendant has are prescriptive. It is conceded that defendant and its predecessors had gained by long usage, extending over the requisite statutory period, a right to maintain the waters above its dam, from season to season, at the head created by the old dam which preceded the construction of 1906. For the extent, if any, to which that would raise the level of the lake and flood complainants' lands, defendant is not liable in damages.

The legal principles involved in this case have been well settled by numerous decisions of this court and other jurisdictions. The real issue presenting a ground for sharp contention is purely one of fact. The question involved is whether complainants have shown that defendant in the rebuilding of this dam in 1906 has, by raising its height, by tightening it against leakage, or by any other means, increased its impounding capacity to obstruct or restrain the natural flow of the river, and thus caused a greater overflow of complainants' lands than had previously existed for the prescriptive period.

The original rights of the upper shore owners protected them against any manipulation of the waters injuriously increasing or diminishing the volume of natural flow so as to raise or lower natural levels. They were not required to deal with a level raised or lowered by artificial means. *Hass* v. *McManus,* 161 Mich. 372 (126 N. W. 462). Where prescriptive rights have arisen by the maintenance of a dam, they cannot be increased by raising the crest of the dam or by maintaining a tighter and more perfect dam at the same height, thus forming a greater obstruction to the flow of water and increasing pondage. *Turner* v. *Hart,* 71 Mich. 128 (38 N. W. 890, 15 Am. St. Rep.

243) ; *Miller* v. *Bank of Belleville,* 148 Mich. 339 (111 N. W. 1062).

Numerous witnesses were sworn on both sides. The testimony given by complainants and their witnesses was largely personal experience and observation from year to year, as to the height of the water and conditions resulting from different levels of the lake. Their testimony was strong and positive that since the construction of the new dam there has been a radical and permanent elevation of the waters of the lake. Their testimony as to the extent varied according to things which they had noticed and the times of observation. Their reasons and cause of remembrance were, in many instances, based on circumstances which especially attracted their attention, like the flooding of boathouses and docks, the killing of timber, extending of the waters back to different shore lines, the smothering of a spring which a witness had been using, the deepening of the water over and disappearance of a rapids which was formerly somewhat difficult of passage by boat on the river between the dam and the lake, and other like matters and incidents of special personal interest. Much of defendant's testimony was by experts, hydraulic engineers, who made certain observations and measurements. There was also testimony introduced by defendant tending to show that the waters of the lake had often been as high before 1906 as subsequently, that the dam had not been raised, but increased head was obtained by dredging the tailrace. There was abundance of conflicting testimony upon the issue involved.

A review of the evidence as a whole shows that defendant's testimony consists very largely of theoretical tests, while that of complainants is chiefly actual tests, or observations and matters of experience with physical conditions on the part of those dwelling in the locality and having occasion to note from time to time where the water stood and what effect it was

having.  Tests from observation and experience are held to be more satisfactory than measurements and theories and, as a rule, controlling when brought in conflict.  *Turner* v. *Hart, supra.*

The circuit judge, who listened to the numerous witnesses testifying before him in open court and had the advantage of hearing and observing them as they testified, took the pains at the close of the testimony to make personal investigation and inspection of the premises, going with counsel for the respective parties to examine the dam, lake, and river, with their environments.  In his opinion he states:

"From the testimony submitted, I am fully satisfied that the new dam, without regard to its height, retards the natural flow of the stream to a greater extent and for longer periods of time than the old dam.  This conclusion is based on fact and not on theory.  One physical fact alone—viz., that while the old dam was used there were rapids in the river a short distance above the dam and now those rapids are entirely obliterated—proves to me beyond any possible question that the new dam offers a greater obstruction to the flow of the stream than did the old.  The further fact that the river is navigable from the dam to the lake now, when before the new dam was erected it was so only from above the rapids, shows very plainly that the above-mentioned condition is a continuing one.  The test to be applied in such cases is not whether the new dam backs the water up farther at times of freshets, but that it holds the water back higher for longer periods of time, one season with another, than the old.  In other words, that it establishes a new normal level, one season with another.  *  *  * And, while the exact difference cannot be determined from the proofs submitted, I am satisfied from a careful consideration of the testimony that the normal level of Intermediate lake, at its outlet, one season with another, has been raised by the new dam to the extent of 24 inches above the normal level, one season with another, under the old dam.  The effect of which is to impose upon the lands of all riparian owners above, a burden which, if permitted to ripen into a

right, is so far reaching that, in my judgment, it should not be allowed if the complainants, or any of them, have any substantial grievance at this time."

There was testimony that Brockway and eight other complainants did have a substantial grievance at that time, and the court found they were entitled to relief asked, to the extent granted. A careful reading of the entire testimony satisfies us that his conclusions are sustained and justified by the proofs, even should the testimony of Brockway, whose veracity defendant particularly assails, be liberally discounted or even disregarded, and that defendant has exceeded its prescriptive right of flowage to the extent stated.

It is urged in behalf of defendant that the damages are "so small to complainants and so great to defendant that an injunction as prayed for should not be granted." In the early case of *White* v. *Forbes*, Walk. Ch. (Mich.) 112, in which a perpetual injunction to restrain the flooding of complainant's land by damming was sustained, it was said:

"The extent of the injury, provided there be a substanial injury done, is of no very great importance. Every man has a right to the enjoyment of his property undisturbed by another, and to be protected in that enjoyment; and, what one may consider of little value, another may esteem very highly. The court will not, in cases of this kind, be governed by dollars and cents alone, but will inquire whether the injury is of such a nature that it can reasonably be supposed to lessen materially the enjoyment of property by its owner."

We are aware that in certain cases, in view of the limited extent of the injury, the limited number of those who have a right to complain, the well-defined extent of possible future injury, laches in understandingly permitting or encouraging heavy expenditures which it could well be foreseen would result in the damage complained of, or other controlling equities,

this court has deferred to the doctrine of comparative damages, and has either left complainants to their remedies in actions at law or granted relief only to the extent of awarding damages, where such were clearly ascertainable.

In this case there is no evidence that complainants countenanced or encouraged the work being done, or had any notice or knowledge that it would result in flooding their lands. It must be concluded that, in any event, defendant had the greater and more exact knowledge of what it was doing and the ultimate result. It gave no notice of what it was doing, or its intentions. It does not in any way appear that it was influenced or encouraged by any conduct or word of complainants. It is not in a position to raise the question of estoppel. *Sheffield Car Co.* v. *Hydraulic Co.,* 171 Mich. 423 (137 N. W. 305), and cases cited.

Intermediate lake is several miles in length and presents an extensive coast line. The number of shore owners who might be injuriously affected by raising the level of the lake and the acreage which might be flooded is unknown, but naturally suggested. There are 12 complainants, owning several hundred acres of land in this case, and their frontage is small compared with the whole. While the damage already done in individual cases may be comparatively small, it is continuing, and inevitably must increase as lands become more valuable and demands for various uses arise.

The following language of the court in *Turner* v. *Hart, supra,* is appropriate here:

"In view of the practical destruction of 300 acres of land or over, be its value what it may, and the consequent, and weekly, and perhaps daily, recurring injury to each of the complainants, for which they severally would have a right of action, presenting a multiplicity of suits and vexatious litigation, it appears to us to be just and equitable that defendants should be decreed to abate and remove the top of their dam so

as to lower the structure 12 inches, and that they should perform such decree on or before the 1st day of December next, and that they should be enjoined from raising the water at their said dam so as to cause the water to set back and overflow the lands of complainants, or either of them, or to such height as will cause the water to set back and percolate through the soil of complainants, or either of them, to a greater extent than was customary or usual prior to the time repairs were made upon said dam in 1881."

We think this case is in line with, and governed by, the principles involved and decided in *A. P. Cook Co.* v. *Beard,* 108 Mich. 17 (65 N. W. 518) ; *White* v. *Forbes, supra; Turner* v. *Hart, supra; Miller* v. *Bank of Belleville, supra;* and *Sheffield* v. *Hydraulic Co., supra.*

It is finally urged in behalf of defendant that, in any event, the form of decree is such that it should be modified to determine and specify the head of water to be carried at the dam, and the court should direct a suitable mark to be established and set at the dam to indicate the same.

We are not satisfied that the physical conditions are such as to render any modification necessary to a proper understanding and execution of the decree; although it is possible that a slight confusion may arise in seeking to harmonize the different paragraphs of the formal decree as drawn, for the reason that in one paragraph it is required that the wasteweir and flashboards in the dam shall be placed not higher than 24 inches below the height at which the cement floor, or sill of said wasteweir or dam was constructed and maintained by defendant on the 7th of October, 1910; and another paragraph seems to provide that the water in the millpond formed by said dam shall be maintained at the same elevation. The decree should be so construed, and if necessary modified, that the defendant shall have the benefit of the full head of water that would naturally flow over the crest of the

dam or weir reduced to the height specified in the decree.

The decree of the trial court is confirmed, with costs in favor of the nine prevailing complainants, treated as one in taxation thereof.

MOORE, MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.