### POTTER *v.* DUNDEE HYDRAULIC POWER CO.

1. WATERS AND WATERCOURSES—DAMS—OVERFLOWING LANDS—PRE-SCRIPTION.

   On a bill by an upper riparian owner to enjoin a mill owner from maintaining a new dam at a level higher than the one replaced, *held*, that the ultimate test of defendant's prescriptive right was the extent to which the old dam raised and held the level of the water it impounded.

2. SAME—DAMS—EVIDENCE.

   Evidence *held*, to show that by the maintenance of a tighter and more perfect dam, even if no higher, defendant had increased its poundage capacity over the old dam to a certain extent and also to show that the height of the new dam at the spillway exceeded that of the old one.

3. DAMAGES—EXCESSIVE VERDICTS.

   A judgment for $840 damages for overflowing plaintiff's farm of 40 acres for 4 years, *held*, excessive to the extent of $200.

4. APPEAL AND ERROR—DAMAGES—MATTERS NOT DECIDED ON TRIAL.

   Where, in an action against a mill owner to recover damages for flooding plaintiff's farm land caused by the building of a new dam higher than the old one, the trial court

holds open the question of damages after March 1st of a particular year contingent on the dam being reduced by the middle of May, with the right to plaintiff to make a showing as to damages, and does not pass on them, the question of damages after March 1st will not be considered on appeal.[1]

Appeal from Monroe; Chester, J., presiding. Submitted June 19, 1917. (Docket No. 90.) Decided December 27, 1917.

Bill by Charles C. Potter and another against the Dundee Hydraulic Power Company to restrain the maintenance of a dam at an excessive height, and for damages caused by flooding. From a decree for plaintiffs, defendant appeals. Modified, and affirmed.

*Willis Baldwin,* for plaintiffs.

*Thornton Dixon,* for defendant.

STEERE, J. Plaintiffs, who are husband and wife, have owned and occupied for more than 20 years an 80-acre farm located upon the north side of the river Raisin about one-half mile up stream and westerly from defendant's dam across said river at the village of Dundee, Monroe county. Approximately one-half of this farm is upland and the remainder flats, or bottom land, along the north bank of the river which plaintiff claims was especially fertile and productive farming land, subject to overflow only in the time of spring freshets, and which he tilled successfully until defendant erected a new and higher dam of concrete in the summer of 1911, raising the level of its millpond and flooding his lowland. This bill was filed in February, 1912, to restrain defendant from maintaining this dam at a higher level than the one it replaced,

---

[1]On liability for damming back water of stream, generally, see note in 59 L. R. A. 817, specifically as to right to increase height of dam, see page 874 of above note.

and to perpetually enjoin defendant from flooding plaintiff's land to any greater extent than had been done by preceding dams erected upon the same site.

It was shown that as early as 1827 a tract of 120 acres of land upon which the dam in question is located was conveyed by the then owner to defendant's predecessors in title, requiring the grantees "to construct a good, substantial, and firm dam across the river Raisin at the best point on the said river on said premises, where they can get the neatest head and fall, and also to construct, excavate, and build a good and sufficient race," etc.

Tradition, supplemented by the testimony of living witnesses, shows that a dam of some kind and height has been maintained since that time at the point where the grantees then decided they could "get the neatest head and fall." No flowage privileges were ever acquired by defendant or its grantors from upstream owners, and beyond the limits of the land first acquired what rights defendant has are by prescription.

During the intervening years age, freshets, and ice floes from time to time made imperative frequent repairs and occasional reconstruction of the dam maintained at this site. According to the memory of the oldest inhabitant, running back some 70 years, the first dam was known as a brush dam, later repaired and reconstructed with logs and known as "a log dam," as early as 1846, which was washed out in whole or in part and rebuilt or repaired occasionally, but retaining that character and name until some time between 1897 and 1900, after being wrecked by a flood, it was restored or rebuilt by its then owner, Mr. Davis, in a more substantial manner, and thereafter known as a "timber" or "rafter dam." This work was done by or under the supervision of a witness named Edwards, who was running the mill, and in charge of the property for Davis. He testified that he was there in

Davis' employ 20 or 21 years, "had everything to do with it while there," and built the "new" or rafter dam about 2 years before he went to Detroit, where he had lived 14 or 15 years. He described the old dam as a "wooden crib dam, made of wood, logs, plank, and dirt." He testified that he measured and intended to build the new dam the same height as the one it replaced. It experienced similar vicissitudes as had its predecessors, requiring frequent repairs, or reconstruction, but was maintained and in use until defendant acquired the property, and the cement dam was constructed according to the plans and under supervision of an engineer who testified to surveys, measurements, photographs, etc., of the old and new dams tending to show that the height had not been increased, and the elevation at the spillway formerly enjoyed by Davis and his predecessors was not exceeded.

After this bill was filed the north end of the new cement dam, built during the summer, washed out, and in October, 1912, plaintiffs obtained a temporary injunction restraining construction of the portion carried away at the height proposed, but upon defendant filing a bond to meet any damages which plaintiffs might recover the dam was permitted to be restored to its former height.

The case was heard in the fall of 1914, and findings were made by the trial court in which the evidence is reviewed and the conclusion reached that the present dam is in fact and effect much higher than former dams, that plaintiffs had suffered damages therefrom amounting to $840 up to the time of the finding, which was adjudicated against defendant, and a mandatory injunction granted requiring the present dam to—

"be cut down 2 feet from the top of the wing, measuring from the top of the wing at the south end of the timber on the north stone wall, and that this dam

be so cut down from the north end to within 50 feet of the flume. This remaining 50 feet may be continued as it is. The headgates in the flume shall not be maintained at any greater ʾheight than that portion of the dam shall be after cutting it back 2 feet."

The principles of law applicable to this controversy are well settled and not in dispute. It is conceded by plaintiffs that defendant has a prescriptive right to maintain adjacent to their land as high a level of backwater as resulted from the old dam, or dams, and to overflow their flats to the same extent. If the new dam does no more, they cannot complain of the burden. It is conceded by defendant that it cannot place an additional servitude upon the upstream shore lands by raising the level of the backwater either through constructing a higher dam or an absolutely tight dam if the former one maintained during the period of limitation was so imperfect or leaky as to regularly allow water to go through it instead of over its crest, thus failing to fully impound the water and maintain a level of which it would be capable if more perfectly constructed and kept tight against leakage. The settled law in this case is abundantly discussed and defined in *White* v. *Forbes,* Walk. Ch. 112; *Turner* v. *Hart,* 71 Mich. 128 (38 N. W. 890, 15 Am. St. Rep. 243) ; *Miller* v. *Bank of Belleville,* 148 Mich. 339 (111 N. W. 1062) ; *Sheffield Car Co.* v. *Hydraulic Co.,* 171 Mich. 423 (137 N. W. 305, Am. & Eng. Ann. Cas. 1914B, 984) ; *Brockway* v. *Power & Light Co.,* 175 Mich. 339 (141 N. W. 693).

It is apparently undisputed that this dam, as were its predecessors, is about 400 feet long, extending nearly north and south across the Raisin river and its adjacent flats to the higher land, or "banks," on either side. The mill and flume are at its south end, on the south side of the river, connected with the pond by a raceway extending from the flume northwesterly

into the impounded water above the dam. The only suggestion of the power developed by any of the dams is found in the testimony of a witness named Pulver, who had lived his life of 67 years in the vicinity of the dam, and was called as a witness by defendant. He testified:

That more horse power was used in the "old times than now"; that "the paper mill used 60, the turning mill 15, and the sawmill 25, making about 100 horse power. The sawmill at times ran from 25 to 30 horse power. It did not have a good wheel. * * * There was power enough to run all these six months in the year, perhaps not so much sometimes; some years it was quite a bit less. * * * In dry weather all these mills could not run continuously."

While testifying to having "blown out a wheel pit under the mill for Davis," and a familiar knowledge of hydrodynamics at that point, by looking at it rather than from any computations, he stated that he never took any measurements, but "everybody knows that the old dam was 30 inches to 3 feet lower than the present dam," which he admitted was merely a guess. Other portions of his testimony as well as that of other witnesses are decidedly out of harmony with this guess, and again there is testimony in the record tending to confirm it; while the guesses, or estimates, of other witnesses place the present dam about the same height as the old.

Defendant claims a prescriptive right to maintain a normal head, or elevation, of about 7 feet 3 inches above the surface of the tail-water at the spillway, and that the present dam is built to that capacity following data and measurements indicating the height of the dam it replaced, while plaintiffs claim greatly increased upper water level resulting from both increased height of dam and better construction.

The height, appearance, and capacity of the brush or log dam are memories only, while numerous photo-

graphs, plans, sketches, etc., accompany the evidence relating to the present dam and the rafter dam immediately preceding it. The abundant testimony is extremely conflicting as to the height at which both the log and rafter dams held the water back, and it is far from harmonious as to the effect of the present dam. While the evidence is at variance as to the comparative heights and results of the log and rafter dams, the more definite and serious issue and burden of plaintiffs' complaint is directed to the claimed increased level of the impounded water and flooding of upstream bottom lands following the erection of the concrete dam. The rafter, or Davis, dam is conceded to have been built in 1897 or 1898. Davis testified that the old dam was dilapidated when he bought the property, that he repaired it so that he had "a nice head of water, about 7 feet 3 inches," although he did not think he ever measured it, and that he continued that amount of water as much as he could until he built the new, or rafter, dam, with which he also calculated to hold back about 7 feet 3 inches of water. He tells of a landowner with whom he had difficulty because he insisted the dam was a detriment to his property, and Davis told him "he had better go slow," but the next year he put in an improved wheel, and had more pressure than he needed, so he cut back the center of his dam 2½ feet on a slant, making a spillway which the testimony indicates and the trial court found lowered the perpendicular of the rafter dam about 10 inches. That year a stone wall about 30 feet in length was built at the north end, as a part of the dam, with a 6x6-inch timber upon the top of it. A year later a stone wall was built at the south end. These walls yet remained at the time of the trial, and were adopted by the court as fixed points with which comparisons could be made in analyzing the conflicting testimony. Witnesses of

defendant testified that the spillways in the concrete dam and in the rafter dam were about the same height, and the water was held at about the same level, while others called by plaintiff testified that it was both higher, some even nearly 3 feet, and proportionally retained the water at a much higher level, and for a longer time, owing to tighter construction. The evidence is convincing that the rafter dam was built somewhat piecemeal, higher in some places than in others and lower at the south end than the north. It may fairly be concluded that as constructed it held the impounded water at a higher level than its predecessor until cut down in the center as shown. Edwards, who constructed it for Davis, was called as a witness by defendant, and testified that he measured the water 20 or 25 feet north of the mill and kept the lowest point of the dam 7 feet 8 inches above bed rock; that, compared with the old dam, it was higher in some places and lower in others; that it would leak badly in the winter, and they would block it up until warm weather came and then fix it; that during the year he was there he knew of no complaints or objections to the height of the water; that he cut down a part of the center to protect the rest of it; that, except for the wings, which he thought would have to be cut off probably to satisfy the people, he was perfectly confident the present dam is no higher than the rafter dam. And, in extenuation of his appearing as a witness, he points out a material distinction in the capacity of the two dams the full significance of which he apparently did not appreciate himself, as follows:

"I feel as though it has put me in a bad place in bringing me down here, because those people are all old friends of mine and old acquaintances, and I believe they are honest in their opinion, but when they look at that dam as it was previous to the new dam there was 18 inches to 2 feet of water below the dam that made the dam look lower, and when they get a

tight dam it makes it look as though it was higher, but if they had spent as many months in there as I have they would know more about the difference."

To the same effect a witness named Rood, in defendant's employ, who had lived in Dundee all his life and had at one time repaired the rafter dam, which he described at length, stated that as near as he could figure it the dam was about 7 feet 8 inches from the bed rock, and the tail-water was about 2 feet deep.

Harry Gray, defendant's superintendent, testified that measurements of the water at the present dam were made daily and sent to the Detroit office, and from the reports he figured the average tail-water as 6 inches.

After listening to the volume of conflicting, and in many respects confusing, testimony which was taken in open court, the circuit judge made personal inspection of the dam in company with counsel for the respective sides, and went up the north bank of the river to the west side of plaintiff's land. At the dam various measurements were made in his presence which are recited in the record.

Adopting the rafter dam as maintained up to the construction of the present dam as the criterion of defendant's prescriptive right of flowage, the court found with ample and convincing testimony that the average previously maintained level of impounded water had been raised materially by the present dam to a height which flooded, soaked with seepage, and destroyed the drainage of plaintiff's lands at times and in a way and to an extent never experienced from the old dams, preventing their tillage and impairing their productivity.

It is stated in the court's findings that defendant claims the present dam is no higher at the spillway than the old dam, but "concedes that the wings on

each side of the spillway are higher, and should be cut down to the height of the spillway." While this concession does not otherwise appear in the record, the strenuous contention of defendant's counsel is that the evidence as a whole conclusively shows, with no contradictory testimony except random estimates and guess work, that the old dam was of the height of the present spillway, and to cut down 2 feet from the top of the wing as ordered would reduce the entire dam several inches (varying from 9 inches to 7⅝ inches) below the surface of the present spillway.

The ultimate test of defendant's prescriptive right is the extent to which the old dam raised and held the level of the water it impounded. The height of the dam, while indicative, is by no means conclusive. There is abundant testimony that the old timber dam was of doubtful construction, not tight, and frequently out of repair, having a tail-water of from 18 inches to 2 feet, as testified to by defendant's own witnesses. The new dam is shown to be of concrete construction, substantial and tight, with an average tail-water of 6 inches. If the height of the old dam was the same as the present one, its impounding capacity was clearly not the same. In that aspect of the case there is abundant testimony to justify the conclusion that by maintaining a tighter and more perfect dam, even though no higher, defendant has increased its poundage capacity over the old dam to the extent directed reduced. There is also abundance of testimony to warrant the trial court in the conclusion that the height of the present dam at the spillway exceeds that of the old one. It would serve no beneficial purpose to further review this in detail, but the testimony found in the ample record considered in its various aspects, and as a whole, satisfies us that the extent to which the trial court determined defendant has ex-

ceeded its prescriptive right of flowage should not be disturbed.

It is further contended that the damages awarded for flooding plaintiffs' lands up to March 1, 1916, the decree for which was filed March 25, 1916, is excessive, and that the testimony upon that subject furnishes no basis to warrant a computation of the amount found by the court due at that date.

The trial court gave judgment in favor of plaintiffs, with right of execution, against defendant in the sum of $840 as damages for excessive flooding of plaintiffs' land to March 1, 1916, and provided that:

"In case the same is not cut down by May 15th, the defendants herein shall have the right to make a further showing as to further damages sustained by them by reason of not cutting down the said dam so that their premises could be cropped during this present year."

It is not questioned that most of plaintiffs' flats had been cleared and cultivated from time to time for many years before the present dam was built. This land was river bottom annually flooded in the spring, subject to the hazard of inundation in time of freshets, fertile as a result, and is shown to have raised good crops when everything went well. Potter claims it has produced as high as 40 bushels of wheat to the acre, and one year, when it was rented, over 100 bushels of corn per acre. He gives no dates, nor what proportion of his flats yielded such crops, nor how often, and no definite data as to his annual income from this land during the many years he owned it. Of its use he stated:

"I pastured some of it, mowed some of it, wheated some of it, corned some of it, barleyed some of it, and some I turned the cattle on."

He testified:

That "40 or 50 acres" of his farm consists of "low flats"; that he has 45 acres of flats; that he did not mean to tell the court there were 45 acres he had not worked since the new dam was built (then two years before), but "during the past two years there are right around from 30 to 40 acres of my land that I haven't worked. I have mowed some of it. All my flats except five acres are in bad condition every day."

Of his damages he said:

"I couldn't judge as to the damage during the last two years because of the water and my not being able to crop the land; it is worth all you can get for it."

Further interrogated, he testified:

"Such land is worth for renting purposes from $5 to $7 per acre, just as you can strike a party and the bargain you can make."

Two other witnesses who own bottom land which they claim was also damaged by flooding give some data as to rental value of such land. S. B. Curtis, who owns bottom land across the river from Potter, stated that before the new dam was built they cropped the land as they wished for many years; that his was used chiefly for hay and pasture; that he had seen June freshets come, and had his land flooded just before hay harvest, and under modern methods of drainage those freshets come more often than formerly; that he thought the new dam made the water from a foot and a half to two feet higher than the old at the spillway, so that the bottom land is soaked with water when not flooded, and the pasture not so good as it would be with the water off; and that with the water off Potter's land could be rented at from $5 to $10 per acre. H. C. Reynolds, who had known Potter's flats for 60 years, testified, "As to the back end of it, they used to work it all." He had seen it in corn, wheat, and meadow, "not all, but portions, of

it," saying of its rental value, "I think they are rent-
ing land there from $4 to $6 per acre for a year, or
for the season." He estimated the difference in height
of water between the old and new dam as about three
feet.

Aside from comparisons and assertions in general
terms, we find no tangible data affording any basis
for determining damages except the testimony of
these three witnesses as to rental value. To take an
average of their lowest estimates would not be out of
harmony with the trial court's discount of their testi-
mony touching the difference between the height of
water as maintained by the new dam and the old,
which we think the record fully warranted. While it
is fairly shown that the productive value of plaintiffs'
land was damaged by and during increased flooding
after the new dam was completed and in operation,
no claim is made of permanent injury if the former
level is restored. Of the four years for which dam-
ages were claimed and awarded there was little, if
any, backwater during the first, when the dam was
under construction. Taking this into consideration,
together with the fact that the productiveness of the
land while impaired was not totally destroyed, and
plaintiff yet had a beneficial use of it for pasture and
hay during these years, we are constrained to con-
clude that the damages awarded should be limited to
$640 on a basis of $4 per acre per year during the
four years in question for 40 acres detrimentally af-
fected, for which we think there is evidential support
in the record.

The matter of damages subsequent to March 1, 1916,
which we are asked to determine, was reserved and
held open by the trial court contingent on the dam
being reduced by the ides of the ensuing May, with
the right given plaintiff to make showing as to fur-
ther damages. That question has not been passed

upon by the lower court, and is not before us on this record.

Modified as to damages as above indicated the decree of the trial court is affirmed, with costs to plaintiffs.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.